Brian SCHNEIDER and Tom Cosgrove, Plaintiffs–Appellants,

v.

INDIAN RIVER COMMUNITY COLLEGE FOUNDATION, INC., Herman Heise, Ira McAlpin, Jr., Standish L. Crews, and Guy Cromwell, Defendants–Appellees.

No. 87–5450.

United States Court of Appeals, Eleventh Circuit.

June 27, 1989.

* Honorable Walter E. Hoffman, Senior U.S. District Judge for the Eastern District of Virginia, sitting by designation.

Frank A. Kreidler, Lake Worth, Fla., for plaintiffs-appellants.

Richard D. Marks, Dow, Lohnes & Albertson, Washington, D.C., Peter C. Canfield, Atlanta, Ga., for defendants-appellees.

Before HILL and ANDERSON, Circuit Judges, and THOMAS *, Senior District Judge.

HILL, Circuit Judge.

Brian Schneider and Thomas Cosgrove, the appellants, brought suit against the Indian River Community College Foundation, Inc., Herman Heise, Ira McAlpin, Jr., Standish L. Crews, and Guy N. Cromwell, the appellees, alleging that the appellees infringed their Fourteenth Amendment due process and First Amendment rights, and alleging that the appellees infringed their Fourteenth Amendment due process and First Amendment rights, and alleging a pendent cause of action under Florida law. The district court granted summary judgment for all defendants. 684 F.Supp. 283.

I. FACTS

Brian Schneider and Thomas Cosgrove were employees of station WQCS ("the station" or "WQCS"), the radio station licensed to the Board of Trustees of Indian River Community College ("the college"). The Indian River Community College is a Florida state educational institution. Herman Heise is the President of the college; Ira McAlpin, Jr., Standish L. Crews and Guy N. Cromwell are all trustees of the college. The Indian River Community College Foundation, Inc. functions as a fundraising arm of the college. WQCS is a non-commercial educational station; its format is fine arts and in-depth news coverage, including news from the National Public Radio network and local public affairs coverage. In addition to the paid staff, some of whom teach, the station is assisted by student interns. Schneider was hired January 6, 1982, and served as station manager; Cosgrove, the program director of WQCS, served from February 9, 1982. Neither was employed under a contract with a fixed term of employment.

The episodes at the heart of Schneider and Cosgrove's First Amendment claims are the following. In March, 1982, President Heise held a meeting with the radio station staff to discuss coverage of the Hutchinson Island development. The Hutchinson Island real estate project apparently was the object of local controversy. At the meeting, he advised them that they should not report on the Hutchinson Island development, as doing so might cause contributors involved in the project to withdraw their support of the college. A few weeks later, Heise expressed concern to Cosgrove about the "slanted" coverage on "Morning Edition," one of the news shows supplied to the station by NPR.[1] In November, 1982, another meeting between President Heise and the staff of WQCS was held. At this meeting, Heise ordered the staff not to air any coverage of the local elections. He stated that coverage would be inappropriate because the college had an interest in the election and several candidates were connected with the college. During the elections, Schneider invited a state representative, Patchett, for an interview with an on-air panel; President Heise allegedly refused to allow the politician to appear. Despite President Heise's admonitions, WQCS did in fact air news stories about the development and

* Honorable Daniel H. Thomas, Senior U.S. District Judge for the Southern District of Alabama, sitting by designation.

1. "Morning Edition" is a feature-length news program produced by National Public Radio and distributed for use by member stations. The show was not withdrawn and is still aired on WQCS.

about the local elections. Later President Heise stopped Schneider in the hall and ordered him to stop communicating with Patchett or Heise would get rid of him.

Sometime after the elections, the wages of all of the radio station employees were frozen, not matching a July 1983 college-wide increase. The freeze itself became a matter of controversy, as the station employees perceived it to be a result of their refusal to adopt President Heise's news programming directions. Cosgrove discussed the freeze and President Heise's control over programming with a reporter from the Port St. Lucie/Stuart newspaper; the story appeared in a local paper. Heise again called a meeting, at which he discussed the staff members' talking to the press; Cosgrove assumed from Heise's manner that talking to the press again would put his job in jeopardy. In August, 1983, Schneider and Cosgrove were warned not to attend a meeting of the Community Advisory Board, a group of supporters of the station, which the trustees were to attend.

On October 25, 1983, the Board of Trustees of the college held an open meeting in which the station was discussed. The appellants requested an opportunity to speak but were not recognized by McAlpin, the chairman of the meeting. Two weeks earlier, Schneider had been dismissed. The dismissal was withdrawn by the college, but he was then terminated on October 31, 1983, this time permanently. Later, Cosgrove was questioned by his supervisors as to whether he was continuing to associate with Schneider. His position with the station was terminated on July 31, 1984.

The appellants present three basic claims on appeal. First, Schneider and Cosgrove claim that the appellees infringed their First Amendment rights by interfering with their coverage of the news. Second, they contend that they were illegally dismissed in retaliation for their exercise of their First Amendment rights of speech and association. Third, Schneider and Cosgrove argue that the college's dismissal of them violated the requirements of due process. The appellants also made an argument below based on Florida law; because jurisdiction in federal court was pendent to the federal claims and the district court dismissed the federal claims, the district court also dismissed the pendent claim for lack of jurisdiction. Therefore, this issue is before us only on the merits of the dismissal. We will analyze the claims separately.

## II. NEWS CENSORSHIP

Schneider and Cosgrove argue that appellees' control over the news programming at WQCS curtailed their First Amendment rights. Four instances are identifiable from the record where President Heise intervened in WQCS' operations to influence the station's coverage. In March, 1982, Heise told a meeting of several staff members of the station not to report on the proposed Hutchinson Island development. A few weeks later, Cosgrove was called into President Heise's office and told that some members of the community had complained about bias in a program regularly run on the station, "Morning Edition." In November, 1982, another staff meeting was held, in which Heise told the staff not to cover the local elections. During this period, Schneider arranged to interview state representative Dale Patchett. While WQCS did in fact cover some of the candidates, President Heise cancelled the interview with Patchett, allegedly because Heise did not like him.

The licensee in this case, the Board of Trustees of the college, is a public institution. The Supreme Court has not reached the question of the range of a *public* licensee's right to exercise editorial discretion over its broadcast programming. *Cf. Columbia Broadcasting System, Inc. v. Democratic National Committee*, 412 U.S. 94, 93 S.Ct. 2080, 36 L.Ed.2d 772 (1973); *see also In the Matter of Michael D. Bramble*, 58 F.C.C.2d 565 (1976). In the Eleventh Circuit, this issue is governed by the analysis in *Muir v. Alabama Educational Television Commission*, 688 F.2d 1033 (5th Cir.1982) (en banc), *cert. denied*, 460 U.S. 1023, 103 S.Ct. 1274, 75 L.Ed.2d

495 (1983).[2] The parties exhibit some misunderstanding about the court's holding in *Muir*, decided "in the twilight of [the former Fifth Circuit's] long and honorable existence." *Muir*, 688 F.2d at 1054 (Johnson, J., dissenting). *Muir* was an en banc decision before 22 judges. *See Muir*, 688 F.2d at 1035. Judge Hill's opinion was joined by nine judges, as well as by Judge Garwood (writing separately but concurring in the opinion)—for a total of 11 judges out of 22. Judge Rubin authored a special concurrence, joined by three judges. Under the principle that, absent a majority opinion, the narrowest concurring opinion is the holding of the case, *see, e.g., Marks v. United States*, 430 U.S. 188, 193, 97 S.Ct. 990, 993, 51 L.Ed.2d 260 (1977), Judge Rubin's opinion is the law of the circuit.

In the opinion of Judge Rubin, the court held that the degree of control which can be exercised consistently with the First Amendment depends on the mission of the communicative activity being controlled. Where, as here, the activity is not designed to function as a pure marketplace of ideas, "the state may regulate content in order to prevent hampering the primary function of the activity." *Muir*, 688 F.2d at 1050. A single content-based programming decision, albeit ill-advised, does not warrant judicial scrutiny. *Id.* at 1052–53; *see generally Red Lion Broadcasting Co. v. FCC*, 395 U.S. 367, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969) (reviewing unique characteristics of broadcast media and need for editorial discretion). Judicial intervention is not appropriate absent the public licensee's "follow[ing] *policies or practices* that transgress constitutional rights." *Muir*, 688 F.2d at 1053 (emphasis added).

■ It is clear that Congress concluded that the First Amendment rights of public television viewers and radio listeners are adequately protected under a system where the broadcast licensee has sole programming discretion but is under an obligation to serve the public interest. *Muir*, 688 F.2d at 1041. We believe this principle

holds true for the employees of the radio station as well. While the appellants may not be deprived of their own First Amendment rights, there is nothing in the Constitution which gives them the right to use the appellees' equipment and license for their own expression. The appellants, as employees of the station, cannot require the Trustees, as licensee, to air any particular view over the station. The Trustees have the broadcast license and thus sole programming discretion. It is the First Amendment rights of the Trustees as licensee that are being exercised by the operation of WQCS, not those of the appellants. This station was not operated as a "public access" broadcaster inviting the public to present programs and views over its facilities. Thus, we find that the Trustees' control of the news programming at WQCS could not have curtailed the First Amendment rights of the appellants.

■ Even if we were to find that the appellants have First Amendment rights in the operation of WQCS, the incidents complained of are insufficient to show any policy or practice on the part of the appellees which transgresses those rights. The kind of policy or practice discussed in *Muir* is one that pervasively "curtail[s] access to ideas," lending a constitutionally impermissible, discriminatory bias to the station's mission. *Muir*, 688 F.2d at 1053. *Muir* cites as examples a practice of favoring one political party or of broadcasting racially or religiously discriminatory views. *Id.* at 1052.

In contrast, the four incidents cited by appellants do not constitute, together or singly, evidence of a broad policy meriting judicial intervention. President Heise allegedly ordered the curtailment of news coverage of the Hutchinson Island controversy in order not to alienate contributors to the college who had an interest in the development project. Taken in its worst light, Heise's objection to "Morning Edition" could constitute pressure from the president not to run a program based on its

---

2. This former Fifth Circuit case was decided after the close of business on September 30, 1981, and is binding precedent under *Stein v.*

*Reynolds Securities, Inc.*, 667 F.2d 33, 34 (11th Cir.1982).

political philosophy. President Heise's cancelling of a planned session with state representative Patchett arguably demonstrates Heise's alleged personal, or institutional, animosity toward the politician. Finally, although President Heise told WQCS staff members not to cover the local elections, it is undisputed that there would have been a conflict of interest with respect to the coverage, and thus, there can be no possible inference of illegal motive. The four incidents thus involve, at worst: (1) a programming decision designed to suppress a viewpoint which might antagonize a potential donor; (2) a programming decision based on political philosophy; (3) a programming decision based on dislike of a particular politician or his views; and (4) a programming decision designed to avoid a conflict of interest. The incidents are not large in number.[3] Neither are they logically cumulative; i.e., each involves a programming decision based on considerations distinct from the others. Thus, it cannot be said that the four incidents are manifestations of a single broad policy or philosophy. Therefore, the appellants have not met their burden under *Muir*, and summary judgment was appropriate.

## III. RETALIATION FOR THE EXERCISE OF CONSTITUTIONAL RIGHTS

■ The appellants contend that the exercise of their constitutional rights was the motivation for their dismissal. It may have been unconstitutional for the college to fire Cosgrove and Schneider if the dismissal was based on their exercise of First Amendment rights. *Mt. Healthy School District Board of Education v. Doyle*, 429 U.S. 274, 283–84, 97 S.Ct. 568, 574–75, 50 L.Ed.2d 471 (1977). The judicial scrutiny of a claim of retaliation against a public employee who asserts that his activity was protected by the First Amendment involves three steps. *Maples v. Martin*, 858 F.2d 1546, 1552 (11th Cir.1988). First, the public employee must show that the speech ad-

dresses a matter of public concern. *Connick v. Myers*, 461 U.S. 138, 146, 103 S.Ct. 1684, 1690, 75 L.Ed.2d 708 (1983); *Id.* Whether an employee's speech addresses a matter of public concern is determined by the content, form, and context of a given statement, as revealed by the whole record. *Connick*, 461 U.S. at 147–48, 103 S.Ct. at 1690–91. If the speech implicates a matter of public concern, it is constitutionally protected. "This court has frequently reaffirmed that speech on public issues occupies the 'highest rung of the hierarchy of First Amendment values.'" *Id.*

Second, the public employee must show that the speech was a "substantial or motivating" factor in the employment decision. *Maples v. Martin, supra,* at 1552. If a plaintiff carries this initial burden on the causation issue, the burden shifts to the employer to show that the same decision would have been made in the absence of the protected conduct. *Mt. Healthy*, 429 U.S. at 287, 97 S.Ct. at 576.

Finally, when both of these requirements have been established, the court will engage in the balancing test set out in *Pickering v. Board of Education*, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968). *See also Mt. Healthy*, 429 U.S. at 284, 97 S.Ct. at 574. The test determines whether the employment decision was justified in light of the competing social interests at stake: "The interest of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the state, as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering*, 391 U.S. at 568, 88 S.Ct. at 1734. "Government offices could not function if every employment decision became a constitutional matter." *Connick*, 461 U.S. at 143, 103 S.Ct. at 1688.

■ In light of its content, form and context, much of the activity pointed to by Schneider and Cosgrove can fairly be said to have addressed matters of public concern.[4] Cosgrove's discussion with the re-

---

**3.** While we note that the number of incidents at issue do not suggest a pervasive bias, we expressly do not decide whether a series of as few

as four incidents can constitute the type of policy or practice described in *Muir*.

**4.** The status of the speech is a question of law. *Maples*, at 1552.

porter from the Port St. Lucie/Stuart News related to two topics: the salary freeze and the programming changes Heise was considering at the paper.[5] Given that the station served the local community, and in the context of the controversy then surrounding the station, the discussion of programming changes can be "fairly considered as relating to any matter of political, social, or other concern to the community." *Connick*, 461 U.S. at 146, 103 S.Ct. at 1689. The salary freeze had itself become part of the controversy, and the reasonable inference is that it was not merely "ammunition for another round of controversy with ... superiors." *Id.* at 148, 103 S.Ct. at 1690. Likewise, Schneider's contact with the press is alleged to have related to the events at WQCS.

In addition, Schneider was rebuked for speaking to the politician, Patchett. Such speech related to matters of public concern.

█ Cosgrove was questioned about associating with Schneider, who had just been fired. Given the on-going controversy, the circumstances give rise to an inference that the association feared by the appellees was Schneider and Cosgrove's politicking and working together to continue the protests of the station's policies.[6]

█ We must next address the causation issue, i.e., whether the evidence presents a genuine issue of material fact as to whether these activities were a "substantial or motivating" factor in Schneider and Cosgrove's dismissal.[7] Upon review of the various episodes proffered by appellants, we conclude that the evidence is sufficient to preclude summary judgment.

Schneider's uncontroverted assertion is that President Heise stopped him in the hall of a college building and ordered him to stop communicating with Patchett or Heise would "get rid of him."[8] Earlier, Heise had expressed animosity toward representative Patchett and vetoed Schneider's efforts to put him on the air. With regard to contact with the press, President Heise's reaction to the Port St. Lucie/Stuart News story—calling a meeting with the station staff, at which he was "extremely upset"—supports an inference that Heise wished to discipline Cosgrove and Schneider for engaging in protected speech.[9] This evidence raises a genuine issue of fact as to whether appellants' speech was a motivating factor in their discharge.

A similar inference is reasonable with respect to Cosgrove's association claim. Taking the facts in the light most favorable to the appellants, Schneider had been fired for his opposition to the station's policies, and Cosgrove's association with Schneider might threaten the college with further

---

5. Cosgrove Deposition 24. The district court found that only Cosgrove, not Schneider, spoke to the press, which finding appellants contest on appeal. The appellants alleged that both Schneider and Cosgrove spoke to the press. Complaint, ¶ 48. Schneider's affidavit reiterates the point. R. 1, Tab 55 (Schneider Affidavit ¶ 13(a)). While Cosgrove's deposition says that he and Terry Griffin, another staff member, spoke to the press on one occasion, Schneider's allegations do not refer to a specific date; because the allegation does not necessarily relate to the same incident, there is no conflict between Cosgrove and Schneider's allegations. The college does not deny that Schneider spoke to the press, *see* Brief of Appellees at 35, and there is no evidence that he did not—i.e., the only evidence is Cosgrove's deposition testimony that Schneider did not speak to the press on one particular occasion. Therefore, the district court failed to view the facts in the light most favorable to the appellants, and, in this summary judgment posture, we must accept as fact that Schneider spoke to the press.

6. Even were there not a reasonable inference that the association claims implicated matters of public concern, associational activity need not relate to a matter of public concern for First Amendment protection to apply. *Hatcher v. Board of Public Education and Orphanage*, 809 F.2d 1546, 1558 (11th Cir.1987) (holding *Connick* inapplicable to freedom of association claims).

7. This is a question of fact. *Maples*, 858 F.2d at 1552 n. 10.

8. R. 1, Tab 55 (Schneider Affidavit ¶ 12).

9. The district court relied on the fact that approximately 10 months had passed between this meeting and Cosgrove's dismissal; while this lapse is relevant, it does not preclude the existence of a genuine issue of fact with regard to Cosgrove's dismissal or with respect to Schneider's, which followed the meeting by approximately one month.

protest. Moreover, there is no immediately apparent alternative reason for the station's inquiries as to Cosgrove's continued association with Schneider.

We do not address the issue raised by the third step of the analysis, i.e., whether, under the *Pickering* balancing test, the dismissals were justified. This is best left for determination by the district court in the first instance after full development of the facts on remand.

■ Appellants also argue that their attempt to speak at the Community Advisory Board meeting and at the Board of Trustees meeting involved matters of public concern, and were a substantial motivating factor in their dismissal. We see nothing constitutionally offensive in the fact that the Board held a meeting to obtain the views of the public and, at that meeting, refused to allow speeches by "insiders" to be given. This is true particularly in light of the fact that the appellants, as employees of the station, had other channels of input if they wanted to present their views to the Board. The appellants had no constitutionally protected right to appear at the Board meeting and speak. This principle also applies to the appellants' attempt to attend the Community Advisory Board meeting, which the Trustees of the college were to attend. Having determined that the appellants had no constitutionally protected right to speak at these meetings, or to demand that the meetings' agendas be enlarged to include the reception of their views, we find that the appellants' claims of retaliatory discharge based on their attempt to speak at these meetings have no merit. We therefore affirm the district court's grant of summary judgment as to this aspect of the retaliatory discharge claim and do not remand this portion of that claim for further consideration.

## IV. DUE PROCESS

Schneider and Cosgrove were not given any hearing before or after the termination of their employment. Cosgrove was not given any advance notice. They contend that these circumstances violated their right to due process.

■ Due process concerns are implicated only when an employee has a property interest in continued employment. *See Board of Regents of State Colleges v. Roth,* 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). The property interest springs from an entitlement that a person has bargained for or has been granted by the government. "[Property interests] are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." *Id.* at 577, 92 S.Ct. at 2709. In the context of public employment, the entitlement is generally created, if it is created at all, by state statute or individual contract. *See Bishop v. Wood,* 426 U.S. 341, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1976). Less formal evidence of a property interest is acceptable if it shows "mutually explicit understandings," which may be implied from the circumstances of the employment. *Perry v. Sindermann,* 408 U.S. 593, 601–02, 92 S.Ct. 2694, 2699–2700, 33 L.Ed.2d 570 (1972). However, a property interest in a benefit is not created out of an "abstract need or desire for it" or a "unilateral expectation of it." *Board of Regents of State Colleges,* 408 U.S. at 577, 92 S.Ct. at 2709. Schneider and Cosgrove argue that their positions at Indian River Community College gave rise to a property right entitling them to due process. They aver that their participation in a pension plan, the benefits of which would vest in 10 years, the description in an employee handbook of employment with the college as "Career Service," and the "unwritten custom and law" that employees had continued employment at the college gave rise to an expectation of continuing employment. Also, appellants point to Fla.Stat.Ann. § 240.339 and the rule implementing it, Fla.Ad. Rule 6a–14.-41, as requiring the college to have hired Schneider and Cosgrove pursuant to a written contract.

■ Appellants have no contract or statutory grant entitling them to continued em-

ployment with Indian River Community College. Neither is their argument that Fla.Stat.Ann. § 240.339 mandates a contract for their employment positions availing.[10] Rule 6a–14.41, which implements the statute, specifically excludes "technical and para-professional personnel, including television station managers, television cameramen ... and other specialized personnel employed in related administrative and instructional areas." It is clear on the face of the rule that Schneider and Cosgrove were not entitled to an employment contract. Therefore, the only way they can establish that they had an expectation of continued employment is if the circumstances of employment created the relevant "mutually explicit understanding."

We do not believe that such an explicit understanding was present. The potential vesting of the pension plan does not itself confer a guarantee that the employee will reach the point of vesting. Most importantly, the appellants have adduced no specific evidence that there was an unwritten custom of tenure. Unlike the situation in *Perry v. Sindermann,* there is no particular aspect of the employment arrangement at the college that makes it likely that an informal custom of continued employment had arisen. *See Perry v. Sindermann,* 408 U.S. at 602, 92 S.Ct. at 2700. We therefore hold that the appellants' had no property interest in continued employment, and that their due process claim must fail.

## V. PENDENT STATE LAW CLAIM

▮ The district court dismissed the appellants' pendent state law claim, based on the Florida Sunshine Law,[11] upon granting summary judgment on all of the claims based on federal law. Because we hold that the district court does have federal question jurisdiction over the retaliatory discharge claim, we vacate the district court's dismissal of the state law claims and remand for further consideration by the district judge.

## VI. CONCLUSION

The district court did not err in granting summary judgment against appellants on their claims of news censorship and due process. We affirm as to those two claims. However, summary judgment was inappropriate with respect to appellants' claim of retaliatory discharge. This claim is remanded to the district court for further consideration as to the incidents involving discussions with a reporter, discussions with a politician and association with a fired employee. We also vacate the district court's dismissal of the pendent state law claim, and remand the same for further consideration by the district court consistent with this opinion.

AFFIRMED in part, REVERSED in part, VACATED in part, and REMANDED.

DANIEL HOLCOMBE THOMAS, Senior District Judge, dissenting:

The majority would reverse this case and remand it to the District Court for a determination as to whether or not the evidence presents a genuine issue of material fact as to whether or not the exercise of their constitutional rights was a substantial or motivating factor in the dismissal of Schneider and Cosgrove.

The trial court granted a Summary Judgment in favor of the Defendants on this issue. The majority feels that this presents a genuine issue of a material fact and therefore should not have been handled by Summary Judgement.

I feel that this matter was correctly handled by the District Court and I would affirm this case.

The District Court in its opinion stated:

"Plaintiff's primary claim in the case before the court is that defendants violated the First Amendment by attempting to censor the news stories broadcast by the community college radio station and by terminating plaintiffs. For pur-

10. During the time at issue, Fla.Stat.Ann. § 240.339 (West 1988) read:
Each person employed in an administrative or instructional capacity in a community col-

lege shall be entitled to a contract as provided by rules of the State Board of Education.

11. Fla.Stat.Ann. § 286.011 (West 1988).

poses of resolving the instant motion, the court shall assume that plaintiffs were in actuality terminated because they broadcast stories regarding development of Hutchinson Island and local political campaigns contrary to the directions of the college president, Dr. Heise."

"The court notes that a factual dispute does exist as to the reasons that plaintiffs were dismissed from their positions with the radio station of Indian River Community College. The factual dispute is not, however, "material." The court has resolved "all reasonable doubts about the facts ... in favor of the non-movant." *Thrasher v. State Farm Fire and Casualty Co.,* 734 F.2d 637, 639 (11th Cir.1984) (quoting *Casey Enterprises v. American Hardware Mut. Ins. Co.,* 655 F.2d 598, 602 (5th Cir.1981)). Even assuming that plaintiffs were dismissed for the reasons that they allege, defendants are "entitled to judgment as a matter of law." Rule 56(a) of the Federal Rules of Civil Procedure."

"The fundamental question presented to this court is whether in making the programming decision at issue and in terminating plaintiffs for ignoring the programming directives, defendants violated the First Amendment rights of the plaintiffs, BRIAN SCHNEIDER and TOM COSGROVE."

This question was answered in the case of *Muir v. Alabama Education Television Commission* 688 F.2d 1033. I agree with Judge Johnson's interpretation of the majority opinion. Though he wrote a dissent, he states therein on page 1054:

"The majority of this Court—now in the twilight of its long and honorable existence—has affirmed Muir RE-VERSED Barnstone in an opinion which grants state authorities unlimited discretion to regulate the content of public television within their control.

I would also refer to "In the Matter of Michael D. Bramble 58 FCC2d. 565 (1976)".

While the appellants raise several questions, their primary claim as heretofore stated, is that their First Amendment rights were violated.

Of all other questions raised, I think Judge Roettger clearly addressed all of them in his opinion of April 30, 1987. I see no need to remand this case to the district Court. I think Judge Roettger's opinion should be affirmed.

Therefore, I respectfully dissent.