A. Newell ALDRICH, Stewart Bramhall, Richard Burton, Julie Carter, Russell Craig, Steven Crogan, Alexis Edwards, Alice Fisher, Michael Fuller, Irwin Pollack, Allen Posewitz, Todd Reeves, David Whedbee and Julie Wroble, Plaintiffs,

v.

Chris KNAB and Jane Doe Knab, husband and wife; Wayne Roth and Jane Doe Roth, husband and wife; and the University of Washington, Defendants.

No. C93–3Z.

United States District Court, W.D. Washington, at Seattle.

July 19, 1994.

**1486**

Todd Maybrown, Allen & Hansen, James E. Lobsenz, Carney, Stephenson, Badley, Smith & Spellman, Seattle, WA, for plaintiffs.

Jon Peter Ferguson, Michael Madden, Tort Claims Div., Nancy Thycesen Day, Atty. General's Office, Seattle, WA, for defendants.

## ORDER

ZILLY, District Judge.

This matter comes before the Court on plaintiffs' motion for partial summary judgment regarding KCMU's "no-criticism" policy, docket no. 37, plaintiffs' motion for partial summary judgment regarding terminations, docket no. 45, and defendants' motion for summary judgment dismissing all claims, docket no. 41. Having reviewed all briefs filed in support of and in opposition to these matters and having heard oral argument, the Court hereby DECLARES that defendants' policy violates the First Amendment, GRANTS in part and DENIES in part plaintiffs' motions in other respects, and GRANTS in part and DENIES in part defendants' motion for summary judgment dismissing plaintiffs' claims.

1. In KCMU's 1993–94 Programming Handbook, the policy was changed to the following:
 The primary focus for music shows is to entertain, and the following activities are not permitted:

## FACTS

KCMU is a non-commercial radio station broadcast at 90.3 FM that is owned and operated by the University of Washington. KCMU Operations Handbook, p. 5, Ferguson Decl., Ex. 2. The University of Washington Board of Regents holds the Federal Communications Commission ("FCC") radio license. *Id.* KCMU depends on contributions from listeners and others to fund its operations. It has three paid full-time employees: a Station Manager, Development Director, and Programming Director. KCMU also has two part-time disc jockeys on the payroll. The station is operated with the assistance of volunteer personnel. *Id.*

Plaintiffs Julie Carter, Russell Craig, Alexis Edwards, Michael Fuller, Todd Reeves, David Whedbee, and Julie Wrobel were volunteer disc jockeys at KCMU. Plaintiffs Richard Burton, Alice Fisher, Irwin Pollack, and Alan Posewitz were volunteers on the news department staff. Plaintiffs A. Newell Aldrich and Stuart Bramhall were KCMU listeners. Am.Compl. at Par. 1.1–1.2.

Defendants are the University of Washington; Wayne Roth, the Director of Broadcast Services for the University; Chris Knab, the Station Manager at the time of the incidents out of which this suit arises; and Tom Mara, the current Station Manager. All three individually-named defendants are employed by the University of Washington. Am.Compl. Par. 1.3–1.6. As station manager, Knab had the authority to make and enforce station policies. Knab Dep. I at 77–87. Defendant Wayne Roth was Knab's direct supervisor. Roth Dep. at 25–26.

In 1992, KCMU maintained a written policy which stated that "on-air criticism of KCMU/University of Washington staff or management policies is strictly prohibited." Programming Guidelines p. 3, Ferguson Decl., Ex. 3.[1] Defendants have conceded

1) Calls to action (of a political, religious, or promotional nature)
2) Airing personal opinions on sensitive local issues
3) Airing personal grievances

that the policy "was written specifically not to have any criticism of the University or staff...." Knab Dep. I at 97. The policy has been interpreted to preclude such criticism not only on-air, but "whenever an individual is acting as a KCMU representative." Defendants' Opposition Brief at 5–6; Knab Dep. I at 93, 106–107; Rollins Decl. at ¶¶ 2–3.

In early 1992, disputes arose between the volunteers, station manager Knab and program director Don Yates. Staff members disagreed with Yates's views on programming issues. Edwards Dep. at 51–52, Wright Decl., Ex. 6. The volunteers opposed implementation of a syndicated broadcast, proposed changes in radio shifts, proposed hiring of paid disc jockeys, and feared losing their positions to paid staff. *See* Programming Ideas notebook ("Notebook") at 169–226; Edwards Dep. at 10–11; Reeves Dep. at 22–24, 29; Burton Dep. at 53–56; Fuller Dep. at 21; Craig Dep. at 23–26, 32, 42.

At a staff meeting on October 12, 1992, management presented the station's plan for programming changes to the volunteer staff. Mara Decl. ¶ 18. Knab told volunteers at that meeting that on-air criticism of proposed programming changes would not be tolerated. Knab Dep. I at 106; Knab Dep. II at 12–13. Notebook at 219. The October staff meeting served as a catalyst for formation by plaintiffs and others of a group called "Censorship Undermines Radio Station Ethics" ("CURSE"). CURSE was formed "with the purpose of informing the community and persons in the KCMU listening audience about the conditions imposed upon KCMU staff members and about certain programming changes contemplated by the managers of KCMU." Am.Compl. at ¶ 3.8; Craig Dep. at 35; Edwards Dep. at 23–25. CURSE established a trust fund to divert listener funds which otherwise would have been contributed

to KCMU. Edwards Dep. at 23–24. Articles, letters, and advertisements critical of KCMU management appeared in local media during this time, and CURSE set up a phone line with a recorded message encouraging listeners to send contributions into the CURSE trust fund rather than to KCMU. The message also asked listeners to send letters to the University of Washington Regents, the University President, University Relations, Wayne Roth, and the CURSE office. CURSE Newsletter, Ferguson Decl., Ex. 4.

Shortly after the staff meeting, Knab terminated the first volunteer, Alexis Edwards, for drafting the following letter:

Dear KCMU supporters and friends,

the below signed are the majority of staff at KCMU, and all are volunteers. We are writing to the community to let them know of several changes taking place at KCMU. KCMU management says that these changes will help to serve you better. We think it's dead wrong.

Most of us (the below signed) have donated our time and effort into volunteering at KCMU for an average of two years, many of us more. We are students and business owners, columnists and scientists, lawyers and musicians, homeowners and renters. For the past ten years we have helped to make KCMU a unique station in a vibrant Seattle "scene".

Recently though, KCMU's paid management has begun a series of changes that threaten to change KCMU, we believe, for the worst. We believe these changes will change the very nature of KCMU, and turn it into a watered-down, less adventurous version of alternative radio. We, the below signed volunteers, are appealing to our listeners directly. We have been left out of the decisionmaking process, and

---

4) Dedicating music to people that is meant to insult, annoy, or embarrass
5) Airing derogatory remarks directed at a specific ethnic group, gender, or sexual orientation
6) Preaching religious beliefs
Please remember that KCMU is not your personal soapbox.... No editorializing of any kind is allowed without the prior approval of the program director.

1993–94 Operation Handbook, Programming Dept. Guidelines, p. 4, Maybrown Decl. of 3/3/94, Ex. C. Defendant Knab has testified that the new policy still prohibits criticisms of the University staff under " 'airing personal grievances' or soapboxing.... that covers anything under the sun, anything that might come up...." Knab Dep. II at 87.

want to appeal directly to our friends and supporters. You hold the purse strings. Edwards Dep., Ex. 1. Edwards typed the draft during her lunch hour on a computer terminal owned by KUOW, the "sister station" to KCMU, and asked a colleague with a printer to print the letter for her. Edwards Dep. at 5, 17, 29, 38–39.

About four hours after she printed the draft, Knab told Edwards that she was terminated as a KCMU volunteer because of the letter. Edwards Dep. at 30–31. Knab stated at that time that he was terminating Edwards because she wrote a document critical of KCMU policies [2] and because he could no longer trust Edwards to speak on the air. Knab Dep. II at 22–26, Maybrown Decl. of 3/3/94, Ex. D.

The next volunteer terminated by Knab was plaintiff Julie Carter. Carter volunteered at KCMU in the music department, served as the volunteer coordinator, and had an airshift as a DJ. Carter Dep. at 8–9. On October 28, 1992, Carter sent an e-mail message critical of changes at KCMU from her workplace at Microsoft to some former KCMU volunteers who also work for Microsoft. Carter Dep. at 18–19; Knab Dep. II at 30–32. Knab called Carter at work to tell her somebody on the advisory board of KCMU had read the e-mail message and called him about it. Carter Dep. at 19. Knab asked Carter why she had not come to him with her concerns about the station. Carter Dep. at 20. Knab also told Carter "I would just appreciate that when you do write your e-mail that you don't title them 'KCMU Press Releases.'" Knab Dep. II at 31–32.

Approximately a week later, Knab called Carter at work to tell her that during a board meeting she had missed, he had asked all the directors "to examine their consciences and decide whether they could continue to work at the station.... He said that if any board member felt that they did not agree with what management was doing, how management was running the station, they should take it upon themselves to step off the board." Carter Dep. at 14. Knab asked Carter to decide within twenty-four hours whether she wanted to remain on the board. Carter Dep. at 14. Carter called Knab back at 4:00 a.m. and left him a message stating that since he had given her an ultimatum, she was giving him two weeks notice of her resignation from the board. See Carter Dep. at 15–16. Knab agrees with these general facts, but denies he gave Carter an ultimatum. Knab Dep. II at 32–36.

Knab terminated plaintiff Julie Wroble, a station DJ, on October 30, 1992. Wroble Dep. at 6, 9. Wroble attended a concert on October 19 that had been promoted by the station, and was asked to welcome a band as a representative of KCMU. Wroble Dep. at 10–12. In her welcoming remarks, Wroble stated that she was from KCMU, thanked the audience for coming to the concert, then said: "I also want to let you know about some changes that are happening at the station ... due to management changing their policies ... KCMU listeners will not hear shows like this. If you want more information talk to me after the show." Wroble Dep. at 12–13. A local entertainment newspaper later mentioned Wroble's remark in an article. Fuller Dec. Appendix A at No. 63. After reading the article, Knab terminated Wroble because she made these comments while acting as a KCMU representative. Knab Dep. II at 9–14, Maybrown Decl. of 3/3/94, Ex. D.

On November 6, 1992, defendant Knab prepared a memorandum that enhanced the "no-criticism" policy. The memo stated that "any comments or programming aimed at making the audience aware of KCMU internal affairs will also not be permitted." Knab Dep., Ex. 2, Maybrown Decl. of 3/3/94, Ex. B. The memorandum also stated that "Any violation of this policy may result in the immediate dismissal of the person or persons involved, and all privileges of being a staff member will be lost." Id. Knab handwrote on the policy "This applies to any and all mentions of events regarding KCMU programming, any editorials over our airwaves, in other words—no mention of internal programming and operations policies are to be

2. The termination was not based on use of station equipment for writing a personal letter; there are no rules prohibiting such use. Edwards Dep. at 29–30; Knab Dep. II at 24–26.

broadcast over KCMU's airwaves. Any questions—Please talk to me...." *Id.*

That day, Knab terminated plaintiff Richard Burton. Burton aired a preview, or "teaser," for a news story regarding the controversy at KCMU that had been prepared without Knab's knowledge by Burton and other volunteers in the news department. Burton Dep. at 30–35; Fisher Dep. at 7. Knab heard the teaser, confronted Burton, and requested that he not broadcast the full news story. Burton said he "understood," but then continued with his program and aired the story anyway. Burton Dep. at 37–41, 47–48, Wright Decl., Ex. 1 and 3. Following the broadcast, Knab dismissed Burton for violation of KCMU's no-criticism policy. Burton Dep. at 48–51.

After the broadcast of the news story that led to Burton's termination, Knab told members of KCMU's New Department that the entire Department was suspended until all volunteers could meet with Knab to affirm that they would follow the policy and agree not to air any news about CURSE or the controversy at the station. Posewitz Dep. at 6, 9–10. Plaintiff news editors Alice Fisher, Irwin Pollack and News Director Allen Posewitz resigned from KCMU rather than adhere to the policy. Posewitz Dep. at 24–25; Fisher Dep. at 6, 14; Am.Compl. at ¶¶ 1.1–1.2. Prior to the incidents with Burton and the news staff, Knab had never given any direction or prohibition with regard to the content of news stories at KCMU. Fisher Dep. at 21–23; Knab Dep. I at 46–47.

Knab terminated Michael Fuller because he stated on the air, on December 5, 1992, that he was not participating in the KCMU fundraiser "as a matter of conscience" and thanked listeners "for your nice calls supporting me in my moral stand on this issue." Fuller Dep. at 5–6. On December 8, Knab terminated Fuller for "insubordination." Fuller Dep. at 61–62 and Ex. 10.

On December 7, 1992, plaintiff Todd Reeves stated on-air that he was "a proud member of CURSE ... an alternative way to support KCMU is to support CURSE," and he announced the CURSE phone number. Reeves Dep. at 37–39. Immediately after this broadcast, Don Yates and Tom Mara suspended Reeves. Reeves Dep. at 50. The following day, Reeves received a letter in his station mailbox informing him that he had been terminated as a KCMU volunteer because his comments on air "were an act of insubordination." Reeves Dep. at 51 and Ex. 1.

On December 10, 1992, plaintiff David Whedbee stated on the air that "CURSE is a volunteer organization ... dedicated to keeping local media accessible to the public and democratic. If you would like to find out more about this organization, please call 298–CURSE." Whedbee Dep. at 4–5. Knab advised Whedbee that he was terminated because he "had been insubordinate for reading an unauthorized public service announcement." Whedbee Dep. at 5.

In December, 1992, plaintiff Russell Craig circulated a petition at KCMU calling for Knab's resignation, which stated:

> Knab has taken a condescending, inattentive, and non-inclusive attitude toward volunteers and their input as well as toward much of the current listening audience, who he has also publicly and intentionally deceived. His stated policies and intentions are not in accordance with the public representation and image of the station, and he has repeatedly refused substantive proposals to establish any effective community input into the station's operation. His infringements on the First Amendment rights of the volunteers and his harsh and inconsistent action against those who voice disagreement with his policies go far beyond what we feel to be the appropriate role of any public radio station manager ...

Craig Dep. at Ex. 1B; Craig Dep. at 9, Ex. 1. Knab dismissed Craig for "insubordinate actions." Craig Dep. at 7.

Plaintiffs have now commenced this action for violation of their First Amendment rights, and seek damages for wrongful termination. Plaintiffs move for summary judgment on their claims that KCMU's "no-criticism" policy violates their free speech rights, and that the termination of station employees for refusal to follow the policy violated their free speech and free association rights.

Plaintiffs also move for summary judgment on their 42 U.S.C. Section 1983 and 1985 claims for damages against the individual defendants for violation of these constitutional rights. Plaintiffs seek a declaration that defendants' no-criticism policy is unconstitutional and seek an order restraining defendants from continuing to utilize the policy. Plaintiffs also seek an order directing defendants to reinstate plaintiffs to their former positions at KCMU.

Defendants argue that their policy is constitutional because, as holders of the FCC licence, they have the right to control the programming on KCMU. Defendants also argue that the terminations were justified because the plaintiff volunteers were insubordinate, and their speech disrupted the internal workings of the station.

## ANALYSIS

### I. SUMMARY JUDGMENT STANDARD

■ Summary judgment is appropriate if the record shows " 'that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.' " *Williams v. I.B. Fischer Nev.*, 999 F.2d 445, 447 (9th Cir.1993) (*quoting* Fed.R.Civ.P. 56(c)). In determining whether there are any genuine issues of material fact for trial, the court must view all of the evidence in the light most favorable to the nonmoving party. *Abuan v. General Electric Co.*, 3 F.3d 329, 332 (9th Cir.1993), *cert. denied*, —— U.S. ——, 114 S.Ct. 1064, 127 L.Ed.2d 383 (1994). This is true even when the court is presented with cross-motions for summary judgment. *High Tech Gays v. Defense Indus. Sec. Clearance Office*, 895 F.2d 563, 574 (9th Cir.1990).

At oral argument, all parties represented to the Court that they believe there are no material issues of fact in dispute in this case, and the Court agrees.

### II. STANDING

Defendants argue that plaintiffs do not have standing to challenge the current KCMU policy "because they are not currently affected by it and cannot demonstrate a reasonable probability that they will be in the future." Opposition Brief at 4 n. 4.

■ Plaintiffs have standing because they are asserting their own First Amendment rights and those of others. In an exception to the general rule of standing, a plaintiff may bring a First Amendment challenge to vindicate the rights of third parties. *Virginia v. American Booksellers Assoc.*, 484 U.S. 383, 392–93, 108 S.Ct. 636, 643, 98 L.Ed.2d 782, 793 (1988). In addition, plaintiffs worked for KCMU, are seeking reinstatement, and if successful, would suffer again from KCMU's policy unless it is struck down. The listener plaintiffs also have standing to challenge the policy as it concerns on-air statements. *See Cinevision Corp. v. Burbank*, 745 F.2d 560, 568 (9th Cir.1984), *cert. denied*, 471 U.S. 1054, 105 S.Ct. 2115, 85 L.Ed.2d 480 (1985); *Kreimer v. Bureau of Police*, 958 F.2d 1242, 1250–55 (3rd Cir.1992).

### III. FREE SPEECH AND THE NO-CRITICISM POLICY

■ The First Amendment to the United States Constitution provides that "Congress shall make no law … abridging the freedom of speech." The First and Fourteenth Amendments prohibit states from singling out and penalizing expression due to the expression's viewpoint. *Police Dept. of Chicago v. Mosley*, 408 U.S. 92, 95–96, 92 S.Ct. 2286, 2290, 33 L.Ed.2d 212, 216 (1972); *De Jonge v. Oregon*, 299 U.S. 353, 364, 57 S.Ct. 255, 260, 81 L.Ed. 278, 283–84 (1937).

First Amendment cases involving the regulation of broadcast media implicate unique concerns due to the general scarcity of broadcast frequencies and the need to balance competing First Amendment interests of broadcasters and the public. The Supreme Court has recognized that the public has a First Amendment right "to receive suitable access to social, political, aesthetic, moral, and other ideas and experiences …," *Red Lion Broadcasting Co. v. F.C.C.*, 395 U.S. 367, 390, 89 S.Ct. 1794, 1807, 23 L.Ed.2d 371, 389 (1969), and that broadcasters have a duty "to present those views and voices which are representative of [the] community and which would otherwise, by necessity, be

barred from the airwaves." *Red Lion,* 395 U.S. at 389, 89 S.Ct. at 1806, 23 L.Ed.2d at 389. On the other hand, the Court has emphasized that while Congress "could surely have decreed that each frequency should be shared among all or some of those who wish to use it, each being assigned a portion of the broadcast day or the broadcast week.... [Congressional and FCC regulations] do not go quite so far." *Red Lion,* 395 U.S. at 390–91, 89 S.Ct. at 1807, 23 L.Ed.2d at 389.

Because of these competing interests, the Supreme Court has held that general First Amendment legal principals cannot simply be applied to broadcast cases without further, specialized analysis:

> Balancing the various First Amendment interests involved in the broadcast media and determining what best serves the public's right to be informed is a task of a great delicacy and difficulty. The process must necessarily be undertaken within the framework of the regulatory scheme that has evolved over the course of the past half century. For, during that time, Congress and its chosen regulatory agency have established a delicately balanced system of regulation intended to serve the interests of all concerned.

*Columbia Broadcasting System, Inc. v. Democratic National Committee,* 412 U.S. 94, 101–102, 93 S.Ct. 2080, 2086, 36 L.Ed.2d 772, 783 (1973) *("CBS ").* *See also FCC v. League of Women Voters,* 468 U.S. 364, 376, 104 S.Ct. 3106, 3115, 82 L.Ed.2d 278, 295–96 (1984).

■ The regulatory system developed by the FCC includes the "fairness doctrine," a requirement imposed by the FCC on broadcasters that discussion of public issues be presented on broadcast stations, and that each side of those issues must be given fair coverage. *Red Lion,* 395 U.S. at 377, 89 S.Ct. at 1799, 23 L.Ed.2d at 382. The Supreme Court has stated that broadcasters' responsibility and accountability under the

fairness doctrine to present representative views on controversial issues is adequately ensured by the FCC's ability to deny license renewal to broadcasters who do not fulfill their responsibilities to the public. *See CBS,* 412 U.S. at 130–131, 93 S.Ct. at 2100, 36 L.Ed.2d at 799–80.

Defendants base their defense of the KCMU policy on these cases. They argue that as holders of the FCC license for KCMU, they have sole, unlimited discretion to decide what will be broadcast and to exclude any broadcasting of material critical of the station or University. At oral argument, defendants argued that they are free to use their station to sponsor discussion on controversial issues of public concern, but to exclude all but one side of any particular debate.

■ However, *CBS* and *Red Lion* concerned the scope of *private* broadcasters' right to be free from governmental regulation. Other considerations become important when a state entity holds a broadcast license because of the danger of governmental censorship through state-held media and because, unlike private broadcasters, the state itself does not enjoy First Amendment rights.[3] *See, e.g., CBS,* 412 U.S. at 149, 93 S.Ct. at 2109, 36 L.Ed.2d at 810 (Douglas, J., concurring); *Muir v. Alabama Educational Television Comm'n,* 688 F.2d 1033, 1056–58 (5th Cir.1982) (Johnson, J., dissenting), *cert. denied,* 460 U.S. 1023, 103 S.Ct. 1274, 75 L.Ed.2d 495 (1983).

Defendants cite several decisions in support of their contention that as a public broadcaster, they are entitled to all the protections extended to private broadcasters. In one of those cases, *Muir v. Alabama Educational Television Commission, supra,* the question facing the Court was whether a public broadcaster could cancel the broadcast of a single, previously scheduled television program based on concerns about its political

---

**3.** *FCC v. League of Women Voters,* 468 U.S. 364, 104 S.Ct. 3106, 82 L.Ed.2d 278 (1984), which concerned public broadcasting stations, did not apply a different analysis than that which the Court had applied to private broadcasters. However, in *League of Women Voters,* the question was whether local public broadcasters could de-

mand an expansion of the range of broadcasting permitted by congressional regulation to include broadcasts of editorial advertising. The Court did not have before it an attempt by a public entity to narrow or suppress the range of viewpoints presented by the public station.

content. *Muir*, a programming rights case, is not dispositive of the issues presented in this case.

In a case more similar to the case before this Court, the Eleventh Circuit reviewed a challenge brought by employees of a community college radio station to prohibitions by the President of the college of their coverage of local elections. *Schneider v. Indian River Community College Foundation, Inc.*, 875 F.2d 1537 (11th Cir.1989). The Eleventh Circuit held:

> The appellants, as employees of the station, cannot require the Trustees, as licensee, to air any particular view over the station. The Trustees have the broadcast license and thus sole programming discretion. It is the First Amendment rights of the Trustees as licensee that are being exercised by the operation of WQCS, not those of the appellants.

*Schneider*, 875 F.2d at 1541. The court held that nothing in the Constitution granted the plaintiffs the right to use defendants' equipment and license for their own expression. The Court also stated that plaintiffs had failed to establish that defendants made their decisions based on a constitutionally-suspect policy or practice. *Schneider*, 875 F.2d at 1541.

■ In the case before this Court, plaintiffs have been allowed to use the defendants' equipment and license for expression of all news and public service announcements on topics that the volunteers consider to be of local interest except those that might be critical of the station or University of Washington. Prohibition of the speech at issue in this case, unlike that in *Schneider*, was based on a policy of suppressing views and commentary based solely on the viewpoint expressed.

This Court need not decide, in this case, the difficult issues raised by the differences between programming discretion of public broadcasters and private broadcasters, if any. The case before this Court is not about KCMU's right to make programming decisions. Plaintiffs do not challenge in this lawsuit KCMU's decision to add syndicated broadcasts to their programming and to add full-time disc jockeys during daytime shifts. The question before this Court is, rather, whether KCMU has a right to prohibit, by policy, all criticism of these programming decisions by its volunteers, and to prohibit all communications to listeners and the public about the changes and the manner in which such decisions were made and implemented, without regard to the form or timing of the communication, simply because the communications are critical of the changes.

Because this case does not concern KCMU's right, as licensee, to control its own programming, the Court finds that the cases concerning programming rights do not provide sufficient direction to resolve the issues before the Court. The Court therefore must look to traditional cases concerning state regulation of speech outside the broadcast media.

■ The permissible degree of governmental control of speech depends on the type of forum in which the speech occurs. *Perry Educational Assoc. v. Perry Local Educators' Assoc.*, 460 U.S. 37, 44, 103 S.Ct. 948, 954, 74 L.Ed.2d 794, 804 (1983). For purposes of First Amendment analysis, public property is categorized as: 1) traditional public fora "which by long tradition or by government fiat have been devoted to assembly and debate"; [4] 2) public areas which are not traditional public fora but "which the state has opened for use by the public as a place for expressive activity"; [5] or 3) public property "which is not by tradition or designation a forum for public communication." *Id.*, 460 U.S. at 45–46, 103 S.Ct. at 954–55, 74 L.Ed.2d at 804–805.

■ Traditional public fora and fora that have been opened by the state for ex-

---

4. Traditional public fora include public streets and parks. *Cornelius v. NAACP Legal Defense and Educational Fund, Inc.*, 473 U.S. 788, 802, 105 S.Ct. 3439, 3449, 87 L.Ed.2d 567, 580 (1985).

5. Public property found by the Supreme Court to have been opened for use as a public forum include meeting facilities at state universities, open school board meetings, and municipal auditoriums and theatres. *Cornelius*, 473 U.S. at 803, 105 S.Ct. at 3449, 87 L.Ed.2d at 580.

pressive activity are both subject to reasonable time, place, and manner restrictions on speech, but all such regulations must be content-neutral and must be narrowly drawn to serve a significant government interest. Content-based regulations must be narrowly tailored to serve a compelling state interest. *Perry,* 460 U.S. at 45–46, 103 S.Ct. at 954, 74 L.Ed.2d at 804–805.

■ Plaintiffs do not argue that public radio stations are traditional public fora, and the Court holds that they are not. Plaintiffs argue instead that the University opened KCMU as a forum for expression, and thereby created a public forum at the station. Plaintiffs argue that defendants have presented no compelling justification for a content-based policy that prohibits any criticism of the station or University.

Defendants argue that they have not converted KCMU into a public forum because the station "is not an open forum for the expressive activities of the public and plaintiffs do not possess the right to freely express their own views." Defendants point to the KCMU Programming Guidelines as evidence that KCMU employment is not freely accessible to the public, including the requirement that volunteers work five hours each week, that volunteers must request an airshift if they want one, and that granting such a request depends on the volunteer's musical and technical knowledge. Programming Guidelines, Ferguson Decl., Ex. 3. Defendants also point out that the Guidelines "warn the volunteers against violating KCMU policy." Defendants' Reply at 8. Finally, not all persons who desire to work at KCMU secure positions at the station. Mara Decl. ¶ 20.

In support of their position that defendants allow public access to KCMU, plaintiffs argue that as long as members of the public volunteer five hours per week of their time at the station, they are permitted to work in a station department developing material for broadcast. Knab Dep. at Ex. 3, Maybrown Decl. of 3/3/94, Ex. A. Plaintiffs also submit evidence that KCMU did not exercise any editorial control over the content of news stories, public service announcements, or music prior to 1992. Knab testified that from

1985, when he became station manager, to the time he fired Burton for airing his news story in 1992, he had never disciplined any person in the news department because of a story and had never told anyone they could not broadcast a story that they wanted to broadcast. Knab Dep. I at 46–47. The plaintiffs have testified that before 1992, no one at the station had ever attempted to control their broadcast of a particular song or news story. Pollack Dep. at 34–35; Fuller Dep. at 51–52, 65–66; Reeves Dep. at 15, 47–48; Edwards Dep. at 16–17, 26; Posewitz Dep. at 35–36; Burton Dep. at 14–16, 21–24; Fisher Dep. at 21–23. Plaintiffs offer evidence that the only restrictions placed on broadcasting by volunteers were the content-neutral FCC regulations regarding obscenity, indecency, and Emergency Station Broadcast test messages. *See* Knab Dep. Ex. 3, Maybrown Decl. of 3/3/94, Ex. A at 20000104–20000108.

■ Although volunteers who worked at the station and had air shifts enjoyed broad freedom to play music and to develop and broadcast news stories of their choosing until defendants began enforcing the no-criticism policy in 1992, plaintiffs have not provided any evidence that volunteers at the station had broadcast personal opinions or affiliations over the air prior to October, 1992, or that anyone had ever criticized KCMU or the University or run news stories about the University or station policies prior to that time. "The government does not create a public forum by inaction or by permitting limited discourse, but only by intentionally opening a nontraditional forum for public discourse." *Cornelius,* 473 U.S. at 802, 105 S.Ct. at 3449, 87 L.Ed.2d at 580. The Court finds, based on the undisputed evidence in the record, that the University did not intend to open KCMU for use as a public forum, and did not in fact do so.

■ Because KCMU is not a public forum, defendants enjoy relatively broad discretion under the First Amendment to regulate speech at the station, but may not do so based solely on the content of the speech. Public property that is not a public forum may be reserved by the state "for its intend-

ed purposes, communicative or otherwise, as long as the regulation on speech is reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view." *Perry,* 460 U.S. at 46, 103 S.Ct. at 955, 74 L.Ed.2d at 805.

> Although a speaker may be excluded from a nonpublic forum if he wishes to address a topic not encompassed within the purpose of the forum ... or if he is not a member of the class of speakers for whose special benefit the forum was created ... the government violates the First Amendment when it denies access to a speaker solely to suppress the point of view he espouses on an otherwise includible subject.

*Lamb's Chapel v. Center Moriches Union Free Sch. Dist.,* 508 U.S. ——, ——, 113 S.Ct. 2141, 2147, 124 L.Ed.2d 352, 362 (1993) (*quoting Cornelius,* 473 U.S. at 806, 105 S.Ct. at 3451). "The reasonableness of the Government's restriction of access to a nonpublic forum must be assessed in the light of the purpose of the forum and all the surrounding circumstances." *Cornelius,* 473 U.S. at 806, 105 S.Ct. at 3453, 87 L.Ed.2d at 584.

■ KCMU broadcasts a variety of music, news, and public service announcements developed by its volunteers. The plaintiffs in this action did not seek to walk into KCMU from off the street and insert speeches or debates into KCMU's programming. The volunteers who were terminated had enjoyed access to the airwaves to develop and broadcast stories of their choosing. Their broadcasting of the brief public service announcements and news stories at issue in this suit fell well within the intended purpose of the forum.

Defendants concede that the public service announcements and news stories at issue were barred from KCMU's airwaves solely because of the viewpoint they expressed. Defendant Knab has admitted that the policy "was specifically written not to have any criticism of the University or staff...." Knab Dep. I at 97, Maybrown Decl. of 3/3/94, Ex. D. The KCMU policy was intended to preclude all criticism of the University and members of the University staff, including

public figures such as President Gerberding. Knab Dep. I. at 96–98. It did not bar presentation of any favorable information. *Id.* at 94, 103–104.

The uncontested evidence shows that the KCMU policy is content-based suppression of speech critical of any aspect of KCMU or the University of Washington. Suppression of particular news stories because of their content constitutes the type of pure viewpoint discrimination prohibited by the First Amendment.

■ KCMU's policy is also unconstitutional in that it was applied not only to bar on-air criticism of KCMU and the University, but to prevent off-air criticism, as well. Defendants do not provide any argument to support the constitutionality of the policy with regard to the off-air speech of plaintiff volunteers. Their only defense of this aspect of the policy is that terminations that occurred for off-air conduct were justified because such speech interfered with efficient operation of the station. These arguments are properly considered in the Court's analysis of the constitutionality of the terminations, *infra.* This defense is not sufficient to shield the policy itself from invalidation.

The Court therefore holds that the KCMU no-criticism policy in effect during the Fall of 1992 was, on its face, an unconstitutional, content-based suppression of viewpoints critical of KCMU and the University of Washington. In addition, the new policy,[6] as interpreted by defendants to include prohibition of any criticism of the station or University, is similarly unconstitutional. Finally, the policies are unconstitutional to the degree that they are interpreted to restrict the off-air speech of station volunteers.

## IV. TERMINATIONS

■ Volunteers, like paid employees, are protected by the First Amendment from loss of their position based on the exercise of freedom of speech. *Hyland v. Wonder,* 972 F.2d 1129, 1136 (9th Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 2337, 124 L.Ed.2d 248 (1993). However, although KCMU's blanket policy suppressing criticism

---

**6.** *See* note 1, *supra.*

of the University violates the First Amendment, the plaintiffs who volunteered at the station cannot demand that KCMU tolerate expression of their speech regardless of its form and regardless of the consequences to the functioning of the station.

■ The government has broader powers to regulate speech when it is acting as an employer than when it is acting as sovereign. *Waters v. Churchill,* —— U.S. ——, ——, 114 S.Ct. 1878, 1886, 128 L.Ed.2d 686 (1994).

> The government's interest in achieving its goals as effectively and as efficiently as possible is elevated from a relatively subordinate interest when it acts as sovereign to a significant one when it acts as employer. The government cannot restrict the speech of the public at large just in the name of efficiency. But where the government is employing someone for the very purpose of effectively achieving its goals, such restrictions may well be appropriate.

*Id.,* at ——, 114 S.Ct. at 1888.

The special concern due to the University, as employer, in this case does not provide a defense to KCMU's no-criticism policy itself. Defendants have not suggested that such a policy is necessary to allow them to maintain an efficient, functioning station. However, the University's interest in maintaining a functioning workplace was implicated during the time that the policy was in effect. Defendants argue that termination of the volunteers who violated the policy was necessary and justified to maintain the authority of station management and prevent the disruption to the station that was caused by their speech. The Court turns, then, to the line of cases governing termination of governmental employees based on their speech.

■ To prevail on a claim that a termination was in violation of the First Amendment and 42 U.S.C. Section 1983, a plaintiff must prove that: (1) the statement that brought on the discharge is one of "public concern;" (2) the constitutionally protected expression is a "substantial" or "motivational" factor in the employer's adverse decision or conduct; and (3) the interests of the plaintiff/employee in commenting on the matter of public concern outweigh the state's interest

in maintaining an efficient workplace. *Sanchez v. City of Santa Ana,* 936 F.2d 1027, 1038 (9th Cir.1990) (citing *Allen v. Scribner,* 812 F.2d 426, 430–32, *amended,* 828 F.2d 1445 (9th Cir.1987)).

### 1. Public Concern

■ Determining whether speech involves a matter of public concern entails an inquiry into the "content, form, and context of a given statement, as revealed by the whole record." *Connick v. Myers,* 461 U.S. 138, 147–48, 103 S.Ct. 1684, 1690–91, 75 L.Ed.2d 708, 720 (1983); *Allen,* 812 F.2d at 430.

■ Defendants argue that plaintiffs' dismissals did not relate to matters of public concern, but rather concerned "internal programming policies and a long-running dispute with management." Opposition Brief at 19. Plaintiffs argue that their communications were a matter of public concern because they "sought to inform the general public about changes in the programming broadcast by KCMU, and the manner in which listener contributions to the station were being spent." Plaintiffs' Consolidated Memorandum at 14.

As evidence that the KCMU controversy was a matter of public concern, plaintiffs point to numerous newspaper and magazine articles about the controversy that appeared in local and national press. Fuller Decl. at par. 19 and App. A. Courts have held that news accounts are evidence of public interest and concern. *Marshall v. Allen,* 984 F.2d 787, 795–96 (7th Cir.1993); *Broderick v. Roache,* 767 F.Supp. 20 (D.Mass.1991). Plaintiffs also point to several hundred letters about the controversy received by KCMU and CURSE, Fuller Decl. at par. 14; Maybrown Decl. at par. 4, and the fact that more than 500 people attended a public meeting to organize and found CURSE. Crowley Dec. at par. 9; Rollins Decl. at par. 3; Fuller Decl. at par. 12.

Defendants argue that the articles do not show public concern, but rather are "a CURSE generated media campaign, mounted only *after* the plaintiffs violated the station's policies...." Defendants' Reply at 10.

These articles "only demonstrate an interest arising from plaintiffs' terminations and the subsequent conflict between CURSE and KCMU." *Id.* However, defendants point to no evidence to support their claim that CURSE generated the articles that appeared broadly in the media. In addition, defendants do not contest that plaintiffs protested not only the programming changes, but also the no-criticism policy, and its application to volunteers. In the context of a community radio station, and controversy surrounding the proposed changes and treatment of volunteers who protested such changes, such matters cannot be described as matters of pure internal concern. *See Schneider v. Indian River Community College Foundation, Inc.,* 875 F.2d 1537, 1543 (11th Cir.1989); *Hall v. Ford,* 856 F.2d 255, 259 (D.C.Cir. 1988). The Court holds that plaintiffs' speech related to matters of public concern.

### 2. Motivation for Terminations

With the exception of a single volunteer,[7] there is no dispute that the plaintiffs' speech was the motivational factor in the defendants' decision to terminate each plaintiff.

### 3. Balancing of Interests

▪▪▪▪ The terminations will survive First Amendment scrutiny if the defendants show that the employees' speech so disrupted the workings of the station that the management's interest in promoting an effective workplace outweighs the plaintiffs' First Amendment rights. *Hyland,* 972 F.2d at 1139 (*citing Rankin v. McPherson,* 483 U.S. 378, 388, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987)). The burden to show disruption is on the government employer. *See Hyland,* 972 F.2d at 1139. The disruption must be "real, not imagined," *Allen,* 812 F.2d at 432, and must be "actual, material and substantial." *Roth v. Veteran's Admin. of United States,* 856 F.2d 1401, 1407 (9th Cir.1988). However, a state employer's reasonable belief that the speech has or will have such an effect is sufficient to justify a termination. *Waters v. Churchill,* — U.S. —, 114 S.Ct. 1878, 128 L.Ed.2d 686 (1994).

▪▪▪ The nature of the government's burden to show disruption varies with the content of the speech. "The more tightly the First Amendment embraces the speech the more vigorous a showing of disruption must be made." *Hyland,* 972 F.2d at 1139 (citing *Connick,* 461 U.S. at 150, 152, 103 S.Ct. at 1692). In this case, the Court finds that the First Amendment interests of the public and plaintiffs in the speech at issue is not as great as in many cases that have come before the courts. Plaintiffs protested the decision to add a nationally syndicated music program and news program to a local community radio station, and the manner in which these and similar decisions were made and opposition silenced. While a matter of public concern, these issues do not rise to the level of speech concerning the performance of public agencies, issues of public health and safety, or facilitation of self government. *Compare Allen v. Scribner,* 812 F.2d 426, 430–32, *amended,* 828 F.2d 1445 (9th Cir.1987); *Roth v. Veteran's Admin. of United States,* 856 F.2d 1401, 1407 (1988). On the other hand, the Court finds that the governmental interest at stake in this case is also relatively slight, because a University radio station is not an agency responsible for the administration of government, and its functioning does not affect public health and safety, or other similar interests. Thus, the Court finds that the governmental burden in this case is not heavy, but defendants must still demonstrate the probability that the speech at issue caused or was likely to cause actual disruption.

▪▪▪ To apply the balancing test, the Court must make a factual inquiry into such matters as whether the speech impairs discipline or control by superiors, disrupts co-worker relations, erodes a close working relationship premised on personal loyalty and confidentiality, interferes with the speaker's performance of her or his duties, or interferes with the regular operation of the enterprise. *Hyland,* 972 F.2d at 1139. The "manner, time and place" in which the speech occurred is also relevant. *Hyland,*

---

**7.** Plaintiff Julie Carter's termination does not appear to be related to any communicative activity.

The Court addresses Ms. Carter's situation in its analysis of each individual termination, *infra.*

972 F.2d at 1139 (*citing Connick,* 461 U.S. at 152, 103 S.Ct. at 1692, 75 L.Ed.2d at 723). The Court first examines the context of the discharges in general, and then with regard to each plaintiff.

Defendants do not submit any evidence that Knab's relationship with volunteers was close or premised on personal loyalty and confidentiality, and they do not contend that plaintiffs' speech interfered with the performance of their jobs.

The record shows that the dispute between staff members and station management over programming changes was expressed and debated strongly, sometimes on a personal level, through a "Programming Ideas" notebook. Notebook at 168–226. The Court has reviewed the Programming Ideas notebook and the parties' depositions and finds that the views expressed by volunteers were part of an exchange of ideas instituted and encouraged by defendants. There is no evidence in the record to the contrary. However, the intensity and content of the dispute reasonably could have been perceived by station management as an indication that discipline and control over volunteers was threatened to some degree by the atmosphere at the station.

Defendants have submitted evidence that during the time period of the terminations, internal conflict at the station escalated, working conditions deteriorated, and morale suffered. Knab Dep. II at 14, 32; Whedbee Dep. at 12; Wroble Dep. at 13–14; Carter Dep. at 17. Volunteers supporting the programming changes reportedly received harassing phone calls. Mara Decl. ¶ 19. Defendants have submitted evidence that harassing phone calls also tied up phone lines and resulted in lost revenues during fundraising. Mara Decl. ¶ 19. Plaintiffs' actions allegedly "crippled the routine operation of the station" because they:

> forced management to confront the plaintiffs and to address listeners regarding plaintiffs' criticisms. Defendants received harassing phone calls at home and at the station, including death threats. Some volunteers refused to fund raise or answer telephones during their shifts (none were required to participate). CURSE called

for a walk-out forcing KCMU to black out the station; donations plummeted.

Defendant's Reply, citing Mara Decl.

■ A general claim that some disruption was caused by the speech at issue cannot shield defendants. Such a claim "cannot serve as a pretext for stifling speech or penalizing public employees for expressing unpopular views." *Allen,* 812 F.2d at 432 (citation omitted). *See also Luethje v. Peavine School Dist.,* 872 F.2d 352, 355 (10th Cir.1989). Unlike the defendants in *Luethje,* defendants in this case have produced evidence of disruption at the station. However, defendants clarified at oral argument that they are not suggesting that plaintiffs were involved in harassing telephone calls, graffiti, and the like. There is no evidence linking this tension and disruption with the speech for which plaintiffs were terminated.

The Court finds that complaints of general disruption of the station cannot be traced to the volunteers' speech, as opposed to reactions by members of the staff and general public to learning about the programming changes and the termination of volunteers. However, the atmosphere at KCMU at the time of the terminations forms part of the context in which each individual termination must be analyzed. With this context in mind, the Court turns to an analysis of each termination.

### Alexis Edwards

■ Knab terminated Edwards several hours after she drafted a letter at the station on her lunch hour that included comments that were critical of KCMU. There is no question that Edward's drafting of the letter constituted expression protected by the First Amendment. The evidence in the record also shows that the speech caused no disruption at the station. Edwards was the first volunteer terminated for criticizing KCMU, and her comments were made off-air, in a letter that was neither published nor distributed prior to her termination.

The Court holds that defendants' termination of Edwards violated her constitutional rights under the First Amendment.

### Julie Carter

■ Plaintiffs' complaint alleges that Carter's discharge resulted from the e-mail message she sent at her workplace, which criticized changes at KCMU. Am.Compl. at ¶ 3.10(b). However, Carter did not testify in her deposition that Knab's demand was based on her e-mail message, and the record does not suggest that the e-mail message triggered Knab's discussion with Carter about the board. Indeed, Carter's testimony indicates that Knab asked all board members to resign if they did not feel they could support management decisions regarding changes at KCMU. Carter Dep. at 14. The record shows only that Carter's resignation was motivated by her unwillingness to support programming changes and/or her objection to being given an "ultimatum" by Knab on that subject.

The Court holds that Carter's termination did not violate her constitutional rights because her speech was not the "substantial" or "motivational" factor in her discharge. *Sanchez,* 936 F.2d at 1038.

### Julie Wroble

■ There is no question that Wroble was terminated for criticizing KCMU while acting as a representative of the station. However, defendants have submitted no evidence to support the conclusion that Wroble was terminated because her speech disrupted the station. Knab learned of the speech only through reading about it in a local newspaper, and terminated Wroble nearly two weeks after the speech. Despite the generally tense atmosphere at KCMU, Wroble was only the second of the volunteers terminated for their speech, and there is no evidence that her comments impaired discipline or relations at KCMU.

The Court therefore holds that Wroble's termination violated her constitutional rights.

### Richard Burton

■ Knab terminated plaintiff Richard Burton because Burton aired a news broadcast regarding the controversy at KCMU after Knab instructed him not to do so. In broadcasting the story, Burton violated Knab's express direction. Burton did so after assuring Knab that he understood Knab's direction. Such direct insubordination by Burton constituted a direct challenge to Knab's authority, and thereby disrupted the station.

The Court holds that defendants' interest in enforcing the station manager's authority over volunteers outweighs plaintiff Burton's expression. Burton's termination did not violate his constitutional rights.

### KCMU News Department

■ The timing of the suspensions of news staff members indicates that Knab's action was in response to the incident with Richard Burton. Given this context and the atmosphere at the station, Knab reasonably could have believed that strong measures were necessary to ensure his control over the programming and volunteers at KCMU. However, the undisputed evidence in the record shows that the resignation of volunteers Alice Fisher, Irwin Pollack and Allen Posewitz was not a result of their initial suspension, but rather was based on their refusal to guarantee to Knab, as a condition of the lifting of the suspension, that they would follow KCMU's no-criticism policy in developing news stories in the future.

While defendants' interest in reasserting their authority over the volunteers at the station may have justified the initial suspensions, defendants have failed to point to any evidence supporting the argument that prospective development of stories about KCMU threatened the continued functioning of the station. The Court holds that the constructive discharge of the news staff members violated their constitutional rights.

### Michael Fuller

■ At oral argument, plaintiffs' attorney explained that Michael Fuller had been granted permission not to participate in asking listeners to send money to the station during a fundraiser. Defendants did not contest this statement. Nevertheless, when Fuller stated on the air, on December 5, 1992, that listeners had called in to ask why he was not participating in the KCMU fundraiser during his program and that he was not participating "as a matter of conscience," Fuller Dep. at 5–6, Knab terminated Fuller

for "insubordination." Fuller Dep. at 61–62 and Ex. 10.

Plaintiffs contend that Knab's identification of "insubordination" as the reason for the discharges beginning in December is a sham: Knab testified that "around either late November or December [Roth] said to me: From now on, if there are any more cases of dismissal, they are simply to be referred to as violations or insubordination." *See* Knab Dep. II at 57.

Even if the "insubordination" grounds for discharge was not a sham, there is no evidence that Fuller was directed to refrain from informing listeners why he was not participating in the fundraiser. Fuller's comments were brief, made during his regular breaks in the music, and were made in response to listener inquiries. He stated simply that he was not participating "as a matter of conscience," and did not elaborate further. The record does not support defendants' contention that Fuller's comments threatened to disrupt the station or defendants' authority over volunteers.

The Court holds that Fuller's discharge violated his constitutional rights.

### Todd Reeves

■ On December 7, 1992, plaintiff Todd Reeves stated on-air that he was "a proud member of CURSE ... an alternative way to support KCMU is to support CURSE," and he announced the CURSE phone number. Reeves Dep. at 37–39. Immediately after this broadcast, Don Yates and Tom Mara suspended Reeves because his comments on air "were an act of insubordination." Reeves Dep. at 51 and Ex. 1.

While the Court has found that public service announcements of this sort constitute protected expression, the evidence shows that at the time of Reeves' discharge, defendants were facing a serious challenge by volunteers to defendants' authority over the volunteers and the station. By December 7, plaintiff Fuller had already been discharged for comments far less related to the controversy at the station than those uttered by Reeves. The Court holds that in this context, defendants' interests in enforcing their authority over the station and volunteers out-weighed plaintiff Fuller's interest in reading the public service announcement.

### David Whedbee

■ On December 10, 1992, plaintiff David Whedbee stated on the air that "CURSE is a volunteer organization ... dedicated to keeping local media accessible to the public and democratic. If you would like to find out more about this organization, please call 298–CURSE." Whedbee Dep. at 4–5. Knab advised Whedbee that he was terminated because he "had been insubordinate for reading an unauthorized public service announcement." Whedbee Dep. at 5.

At the time of Whedbee's discharge, plaintiff Reeves had already been discharged for reading a similar public service announcement. Under the circumstances, Whedbee's insistence on reading the same announcement could reasonably be perceived by defendant Knab as a threat to Knab's authority, and thus a disruption of the operation of the station.

The Court holds that Whedbee's termination was constitutional.

### Russell Craig

■ Russell Craig was dismissed for "insubordinate actions" after circulating a petition calling for Knab's resignation. Craig Dep. at 7. Craig's petition concerned matters of public interest. However, it was circulated at a particularly volatile time in the station. In December, Knab faced renewed challenges to his authority every few days, a situation aptly described by defendants' counsel at oral argument as a "mutiny." In this context, the Court finds that defendants' reasonably could have concluded that Craig's circulation of a petition calling for Knab's resignation had the potential to disrupt the further operation of the station and defendants' authority over the station and volunteers.

The Court holds that defendants' termination of Craig did not violate his constitutional rights.

## V. QUALIFIED IMMUNITY

■ As an initial matter, plaintiffs argue that defendants waived their qualified immu-

nity defense because they failed to suggest that they would raise this defense in any of their pleadings. Qualified immunity is an affirmative defense that the defendant has the burden of pleading. *Camarillo v. McCarthy,* 998 F.2d 638, 639 (9th Cir.1993) (*citing Gomez v. Toledo,* 446 U.S. 635, 640, 100 S.Ct. 1920, 1923, 64 L.Ed.2d 572 (1980); Fed.R.Civ.P. 8(c)).

 Defendants first raised their qualified immunity defense in these cross motions for summary judgment. However, where there is no prejudice to a plaintiff, courts permit relief from waiver of the qualified immunity defense. *See, e.g., Camarillo.* Plaintiffs argue that they will be "deeply prejudiced" if the Court permits such relief here because of the late date at which the defense first was mentioned, and argue that they should not be required to address qualified immunity issues without having an opportunity to conduct discovery regarding defendants' claim. Plaintiffs' Reply at 11. However, in their briefs and at oral argument, plaintiffs failed to articulate any specific discovery they would have conducted had they known about the defense, or to point to examples of the absence of information in the record necessary for them to address the issue.

The Court finds that plaintiffs have not been prejudiced by defendants' late raising of the qualified immunity issue. The Court therefore addresses this defense on the merits.

 Qualified immunity shields public employees who perform discretionary functions from liability for civil damages.[8] where "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396, 410 (1982). Whether the legal rights allegedly violated were clearly established must not be analyzed too abstractly. *Anderson v. Creighton,* 483 U.S. 635, 639, 107 S.Ct. 3034,

3038, 97 L.Ed.2d 523, 530 (1987). The appropriate inquiry is whether, in light of pre-existing law, the unlawfulness of the official's actions must have been apparent. *Id.* at 640, 107 S.Ct. at 3039. *See also Burgess v. Pierce County,* 918 F.2d 104, 105 (9th Cir.1990); *Wheaton v. Webb–Petett,* 931 F.2d 613 (9th Cir.1991). "The contours of the [constitutional] right must be sufficiently clear that a reasonable [official] would understand that what he is doing violates that right." *Anderson,* 483 U.S. at 640, 107 S.Ct. at 3039, 97 L.Ed.2d at 531.

 When considering motions for summary judgment based on a qualified immunity defense, the court makes a three-part inquiry. The court must: (1) identify the specific right allegedly violated; (2) determine whether that right was so clearly established as to alert a reasonable official as to its constitutional parameters; and (3) determine whether a reasonable official could have believed the conduct at issue was lawful. *Romero v. Kitsap County,* 931 F.2d 624, 628 (9th Cir.1991). The plaintiff bears the burden of proof that the right allegedly violated was clearly established at the time of the alleged misconduct. If the plaintiff carries this burden, then the defendants must prove that their conduct was reasonable even though it might have violated constitutional standards. *Id.* at 627. With this standard in mind, the Court analyzes whether defendants should be granted qualified immunity for the terminations of the volunteers whom the Court has found were unconstitutionally discharged.

### Alexis Edwards

 In terminating Edwards, Knab violated her constitutional right to express her opinions about a matter of public concern in a private, nondisruptive manner. Constitutional protection of such speech is clearly established. The Court finds that no reasonable employer could have believed under the circumstances that Edward's drafting of the

---

**8.** The qualified immunity defense applies only to plaintiffs' claim for civil damages against the individual defendants, and does not affect the Court's ruling on plaintiffs' claims for injunctive relief. *Los Angeles Police Protective League v.* *Gates,* 995 F.2d 1469, 1472 (9th Cir.1992). Thus, reinstatement of plaintiffs to their former positions is not barred by the doctrine of qualified immunity. *Id.*

letter would result in disruption to the operation of the station or could constitutionally form the basis of her termination.

Defendants are not entitled to qualified immunity for their termination of Edwards.

*Julie Wroble*

██ The Court finds that the law concerning whether Wroble's termination was constitutional was unclear at the time of her termination. As demonstrated in this Order, the Supreme Court generally has given private broadcasters wide discretion over programming, and the applicability of this law to public broadcasters has not been explored fully by courts. Although the volunteers' criticisms in this case are legally distinguishable from the programming matters courts have addressed, the distinctions made in this Order have not been explored or set forth in prior cases.

Against this legal backdrop, KCMU's no-criticism policy cannot be said to have been clearly unconstitutional at the time it was implemented and applied. Because Wroble spoke at a concert as a representative of KCMU, Knab reasonably could have believed that Wroble's speech was analogous to "on-air" speech, over which he reasonably could have believed he had complete control.

The Court holds that defendant Knab is entitled to qualified immunity for his termination of Wroble.

*Michael Fuller and the News Staff*

For the reasons set forth in the Court's discussion of Wroble's termination, Knab reasonably could have believed that his termination of Fuller for on-air comments and his direction to news staff members to comply with the no-criticism policy in their development of news stories were constitutional. The Court holds that defendants are entitled to qualified immunity for the termination of Michael Fuller and the constructive discharges of Alice Fisher, Irwin Pollack, and Alan Posewitz.

## VI. ASSOCIATIONAL RIGHTS

██ The free-speech clause of the First Amendment encompasses protection of the right to associate with others "in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends." *Board of Directors of Rotary Int'l v. Rotary Club of Duarte,* 481 U.S. 537, 548, 107 S.Ct. 1940, 1947, 95 L.Ed.2d 474, 486 (1987) (*quoting Roberts v. United States Jaycees,* 468 U.S. 609, 622, 104 S.Ct. 3244, 3252, 82 L.Ed.2d 462 (1984)). State action that chills the freedom of association "is subject to the closest scrutiny." *NAACP v. Alabama,* 357 U.S. 449, 460–61, 78 S.Ct. 1163, 1171, 2 L.Ed.2d 1488, 1499 (1958). The state may not subject a public employee to adverse actions because of the employee's political beliefs and associations. *Branti v. Finkel,* 445 U.S. 507, 515–17, 100 S.Ct. 1287, 1293–94, 63 L.Ed.2d 574, 582–82 (1980).

Plaintiffs identify the associational harm to CURSE members as the harm of being denied the opportunity to have its meetings announced on KCMU. Plaintiffs analogize to the case *Healy v. James,* 408 U.S. 169, 92 S.Ct. 2338, 33 L.Ed.2d 266 (1972), in which the Supreme Court held unconstitutional the refusal of Central Connecticut State College to recognize the student group Students for a Democratic Society ("SDS"). The Court held that such denial burdened the students' associational rights because they were not permitted to announce their meetings and other activities through use of campus facilities, or to meet on campus. 408 U.S. at 181–82, 92 S.Ct. at 2346, 33 L.Ed.2d at 279–280.

██ The case before this Court is unlike *Healy* because of the degree of interference with plaintiffs' associational activities. The *Healy* court found that the University's failure to recognize the group seriously harmed the ability of the group to exist and grow. *Healy,* 408 U.S. at 176, 92 S.Ct. at 2343–44, 33 L.Ed.2d at 276. By contrast, plaintiffs have provided no evidence that defendants' actions posed serious problems for CURSE. Defendants have submitted uncontested evidence that plaintiffs had access to and used other methods of communication apart from announcements on KCMU, including printing announcements in the daily University newspaper and posting notices throughout the University. Mara Decl.; Fuller Decl.App. A.

The record shows that over 500 people attended a public meeting to organize and found CURSE. Crowley Decl. at ¶ 9; Rollins Decl. at ¶ 3; Fuller Decl. at ¶ 12.

Plaintiffs also point to other incidents as violative of their associational rights, including the terminations of Todd Reeves and David Whedbee for reading public service announcements about CURSE on KCMU and an incident in which Knab forbid a volunteer who is not a party to this lawsuit from mentioning CURSE on the KCMU telephone. Rollins Decl. at par. 4.

Knab has testified that he would not allow a public service announcement about CURSE to be read over the air. Knab Dep. I at 116. He has also agreed that he "ha[d] a problem with members of CURSE working at KCMU" because "the goals and objectives of that organization are not the goals of KCMU's management policy and the direction that we were going." Knab Dep. I at 118. Plaintiffs compare Knab's disagreement with CURSE goals and philosophy to the college president's opposition to SDS goals and philosophy in *Healy,* where the Court held that the "College, acting here as an instrumentality of the State, may not restrict speech or association simply because it finds the views expressed by any group to be abhorrent." *Healy,* 408 U.S. at 187, 92 S.Ct. at 2349, 33 L.Ed.2d at 283. However, plaintiffs point to no evidence that Knab terminated any of the volunteers *because of* their CURSE membership. Any CURSE member who was terminated was terminated only after some triggering incident that came under Knab's interpretation of the no-criticism policy.

The Court therefore GRANTS defendants' motion for summary judgment that they did not violate plaintiffs' First Amendment rights to free association.

## CONCLUSION

For the reasons set forth above, the Court GRANTS plaintiffs' motion for summary judgment regarding the no-criticism policy,
docket no. 37, DECLARES that KCMU's no-criticism policy violates the free speech component of the First Amendment, and ENJOINS defendants from continuing to utilize the no-criticism policy or from interpreting the current policy in such a manner.

The Court further GRANTS in part and DENIES in part plaintiffs' motion for summary judgment regarding terminations, docket no. 45, and holds that the terminations of plaintiffs Alexis Edwards, Julie Wroble, Michael Fuller, Alice Fisher, Irwin Pollack, and Alan Posewitz violated their constitutional rights under the First Amendment. The Court ORDERS defendants to reinstate these plaintiffs to their former positions. The Court holds that the individual defendants shall be liable for any damages under 42 U.S.C. Section 1983 and 1985 only as to the termination of Alexis Edwards, and are entitled to qualified immunity with regard to the other terminations.

The Court further GRANTS in part and DENIES in part defendants' motion for summary judgment dismissing all claims, docket no. 41, and DISMISSES the plaintiffs' free association claims and the termination claims of plaintiffs Richard Burton, Russell Craig, Todd Reeves, and David Whedbee.

The Court sets a status conference for Thursday, August 4, 1994 at 2:00 p.m. to discuss the issues remaining in this case.

IT IS SO ORDERED.