157 F.3d 271
 Dixie L. McVEY, Plaintiff-Appellee,
v.
Kenneth L. STACY, Chairman of the Virginia Highlands Airport
Commission, Individually, and in his official capacity of
Chairman; Richard H. Kiser, Member of Virginia Highlands
Airport Commission, Individually, and in his official
capacity as member; James D. Vicars, Member of Virginia
Highlands Airport Commission, Individually, and in his
official capacity as member; Thomas Phillips, Member of
Virginia Highlands Airport Commission, Individually, and in
his official capacity as member; David C. Johnson, Member
of Virginia Highlands Airport Commission, Individually, and
in his official capacity as member; David Haviland, Member
of Virginia Highlands Airport Commission, Individually, and
in his official capacity as member; F. Ellison Conrad,
Member of Virginia Highlands Airport Commission,
Individually, and in his official capacity as member;
Beatrice Hutzler, Member of Virginia Highlands Airport
Commission, Individually, and in her official capacity as
member, Defendants-Appellants,
and
Virginia Highlands Airport Commission, Defendant.
 No. 97-1691.
 United States Court of Appeals,
Fourth Circuit.
 Argued May 8, 1998.
Decided Sept. 10, 1998.
 
 ARGUED: Steven Ray Minor, Elliott, Lawson & Pomrenke, Bristol, VA, for Appellants. Joseph Franklin Dene, Dene & Dene, P.C., Abingdon, VA, for Appellee.
 Before MURNAGHAN, NIEMEYER, and MICHAEL, Circuit Judges.
 Affirmed and remanded by published opinion. Judge NIEMEYER wrote the opinion for the court, in which Judge MURNAGHAN and Judge MICHAEL joined as qualified by Judge MURNAGHAN'S concurring opinion. Judge MURNAGHAN wrote an opinion concurring in part and concurring in the judgment, in which Judge MICHAEL joined. Judge MICHAEL wrote a separate opinion concurring in part and concurring in the judgment.
 OPINION
 NIEMEYER, Circuit Judge.
 
 
 1
 Dixie L. McVey was fired as manager of the Virginia Highlands Airport in Abingdon, Virginia, in July 1996. Claiming that her termination was in retaliation for her exercise of her First Amendment rights, she sued the Virginia Highlands Airport Commission and its members under 42 U.S.C. § 1983. The defendants moved to dismiss the case under Federal Rule of Civil Procedure 12(b)(6), based in part upon the commissioners' claim of qualified immunity. When the district court rejected the defense as a ground for dismissal in order "to wait for those factual issues to be explored in discovery," the commissioners appealed. We affirm and remand for further development of the record on the issue of qualified immunity.
 
 
 2
 * The relevant facts alleged in the complaint are taken to be true for purposes of this appeal of an order dismissing the complaint under Federal Rule of Civil Procedure 12(b)(6). See Vickers v. Nash Gen. Hosp., Inc., 78 F.3d 139, 141 (4th Cir.1996).
 
 
 3
 Dixie L. McVey was hired in 1985 by the Virginia Highlands Airport Commission--a commission consisting of eight commissioners--and was appointed Airport Manager of the Virginia Highlands Airport in 1989. McVey managed the airport during a period of "unprecedented development and expansion," and, under her leadership, successful improvements were made to the airport for which she and the airport received "numerous instances of public recognition."
 
 
 4
 In March 1996, the local newspaper, the Abingdon Virginian, submitted a request to McVey and to the Airport Commission under the Virginia Freedom of Information Act ("FOIA"), Va.Code § 2.1-340 et seq. The submission included a request for reports detailing sexist and racist remarks made by commissioners as well as other information that would embarrass the Commission. After McVey began to assemble the requested documents and to prepare others to provide information not contained in existing documents, Kenneth Stacy, chairman of the Commission, allegedly advised McVey to pursue improper tactics that would " 'buy time' so the Commission could prepare for impending public awareness of its wrong-doings." Stacy also instructed McVey not to generate new documents in response to the inquiry. He and other commissioners did, however, generate notes of public meetings that did not then exist.
 
 
 5
 When preparation of the FOIA response was completed, Stacy demanded that McVey certify its correctness. McVey alleged in her complaint that because she had not been present at some of the meetings and had "personally witnessed Commissioners falsifying records," she declined to certify "the correctness of certain documents." Shortly thereafter, on May 16, 1996, the Airport Commission suspended McVey, giving no reason at that time for its action. A month later, however, it sent her a letter giving reasons, including, among others, McVey's insubordination, her inattention to detail on the job, her inept handling of the FOIA request, her taking a position with respect to the FOIA request "which was intended to embarrass the Commission," and her refusal to sign the response to the request. On July 31, 1996, the Commission voted unanimously to terminate McVey's employment.
 
 
 6
 Contending that the Airport Commission's reasons for terminating her were false and defamatory, McVey filed suit against the Commission and against the eight individual commissioners, alleging in seven counts: a First Amendment violation, "denial of due process-property interest," "denial of due process-liberty interest," defamation (in two counts), wrongful discharge, and punitive damages, and she attached to the complaint the Airport Commission's termination letter. The defendants filed a motion to dismiss the complaint. Among the grounds asserted by the individual defendants was a claim of qualified immunity.
 
 
 7
 In responding to the Commission's motion to dismiss, McVey centered her First Amendment claim on the Commission's retaliation for her refusal to sign a false response to the FOIA request and for her sending a separate letter to the Abingdon Virginian. Although this letter was not originally part of the complaint, the district court allowed McVey to amend her complaint to include the letter as an exhibit. It stated:With regard to the package of information submitted to you in response to the referenced request, please be advised that I do not "certify" in any way to some documents included in that package. The documents in the package were compiled partially from Airport Commission records and partially from documents submitted to me by Members of the Airport Commission on April 4, 1996 and stamped received on that date. I can only verify the documents which were assembled and presented to the Virginia Highlands Airport Commission for their review in order to respond to your request, which documents did not include those documents stamped received April 4, 1996.
 
 
 8
 This will confirm that due to my position in this matter, Mr. Ken Stacy, Chairman of the Virginia Highlands Airport Commission, requested me to prepare a separate letter of my position on this matter.
 
 
 9
 While the district court dismissed McVey's due process claims, it declined to dismiss her First Amendment claim and rejected the defendants' qualified immunity "at this stage in the litigation" because "the record ha[d] not been developed" on whether McVey's First Amendment interests were outweighed by the Commission's interest in not disrupting management of the airport.
 
 
 10
 The individual commissioners noticed this interlocutory appeal from the district court's order denying them qualified immunity on McVey's First Amendment claim. See Mitchell v. Forsyth, 472 U.S. 511, 530, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985).
 
 II
 
 11
 As a threshold matter, we must determine whether the district court's order, which essentially defers consideration of the immunity defense until the facts were better developed, is an appealable order. The district court in addressing the defendants' challenge to McVey's First Amendment claim and their immunity defense for that claim, both of which were raised on a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), observed that "[t]he record before the court, at this early stage in litigation, is sparse as to what the relative interests of the parties are." Focusing more particularly on the immunity defense, the district court noted, "when there are factual issues intermingled with the legal question, the court may find it necessary to wait for those factual issues to be explored in discovery or in some cases may even require trial by a jury or by the district court." Cf. Johnson v. Jones, 515 U.S. 304, 115 S.Ct. 2151, 2156, 132 L.Ed.2d 238 (1995) (holding that on a summary judgment motion raising an immunity defense, the determination of "which facts a party may, or may not, be able to prove at trial" is not appealable). But when a district court declines to give a qualified immunity defense at the dismissal stage of litigation a hard look, it risks unwittingly the forfeiture of some protections afforded by that defense. Qualified immunity includes "an entitlement not to stand trial or face the other burdens of litigation, conditioned on the resolution of the essentially legal [immunity] question." Behrens v. Pelletier, 516 U.S. 299, 116 S.Ct. 834, 838-39, 133 L.Ed.2d 773 (1996) (quoting Mitchell v. Forsyth, 472 U.S. 511, 526, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985)). It is therefore incumbent on the courts to review the immunity defense critically at an early stage of the proceedings to determine the legal questions of whether the plaintiff has asserted a violation of a constitutional right and, if so, whether the constitutional right allegedly violated was clearly established at the time the defendant acted. See Siegert v. Gilley, 500 U.S. 226, 231-32, 111 S.Ct. 1789, 114 L.Ed.2d 277 (1991); DiMeglio v. Haines, 45 F.3d 790, 795 (4th Cir.1995).
 
 
 12
 We recognize that the district court's order essentially deferring a ruling on qualified immunity would appear, at first blush, to amount to a routine procedural order that is generally not appealable. Trial court determinations about the order of discovery, about motions, and about how to resolve disputed issues fall within the core of the trial court's power to conduct litigation, and it has long been the judicial policy not to review such rulings until a final judgment has been entered. See MDK, Inc. v. Mike's Train House, Inc., 27 F.3d 116, 119 (4th Cir.1994). Similarly, when a trial court concludes that it has insufficient facts before it on which to make a ruling, that conclusion would also appear not to be appealable. And if we were to construe the district court's order in this case to be of the type addressed in Johnson, it would also not be appealable for that reason.
 
 
 13
 But in rejecting the immunity defense "at this early stage," the district court necessarily subjected the commissioners to the burden of further trial procedures and discovery, perhaps unnecessarily. Its order implicitly ruled against the commissioners on the legal questions of (1) whether the plaintiff has adequately stated a claim for violation of a First Amendment right, and, if so, (2) whether the asserted constitutional right was clearly established at the time the defendants acted. See Siegert, 500 U.S. at 231-32, 111 S.Ct. 1789; DiMeglio, 45 F.3d at 795. These questions do not raise factual questions concerning the defendants' involvement, which would not be appealable under Johnson. On the contrary, they are answered with the facts of the complaint assumed to be true as a matter of law. They are therefore the very questions that Mitchell held were appealable.
 
 
 14
 An analogous circumstance was presented in Behrens. The district court in that case denied the defendant's motion to dismiss on immunity grounds "without prejudice, on the ground that it was premature given the lack of discovery." 116 S.Ct. at 837. The defendant appealed the "implicit denial of his qualified-immunity defense." While the Ninth Circuit recognized its power to hear that collateral order, it denied the immunity defense on the merits and remanded the case to the district court for further proceedings. Following completion of discovery, the defendants filed a motion for summary judgment, again asserting qualified immunity. Again, the district court rejected the defense because material issues of fact remained. On the second appeal, the Ninth Circuit dismissed the appeal for lack of jurisdiction on the ground that the defendant was entitled to only one interlocutory appeal for its immunity defense. The Supreme Court rejected the one-appeal rule and held that "an order rejecting the defendant's qualified immunity at either the dismissal stage or the summary-judgment stage is a 'final' judgment subject to immediate appeal." Behrens, 116 S.Ct. at 839. When immunity is reviewed at the dismissal stage, "it is the defendant's conduct as alleged in the complaint that is scrutinized for 'objective legal reasonableness.' " Id. at 840. Explaining that appeal rights cannot depend on the facts of a particular case and on their development, the Court said that appeal rights "must be determined by focusing upon the category of order appealed from." Id. at 841 (emphasis added).
 
 
 15
 We conclude likewise that we have jurisdiction to consider whether the defendants' conduct as alleged in the complaint is, as a matter of law, protected by qualified immunity.
 
 III
 
 16
 To avoid excessive disruptions of government, a qualified immunity is recognized to protect government officials performing discretionary functions from civil damage suits "insofar as [the officials'] conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982); see also Cromer v. Brown, 88 F.3d 1315, 1324 (4th Cir.1996). Officials lose the protection of the immunity only if it appears that (1) they violated a statutory or constitutional right of the plaintiff, and (2) the right was "clearly established" at the time of the acts complained of such that an objectively reasonable official in their position would have known of the right. Id.; see also DiMeglio, 45 F.3d at 796. These are legal questions that are subject to de novo review. See Pritchett v. Alford, 973 F.2d 307, 313 (4th Cir.1992).
 
 
 17
 Because the qualified immunity of government officials depends at the outset on the existence of a constitutional right, "[a] necessary concomitant to the determination of whether the constitutional right asserted by a plaintiff is 'clearly established' at the time the defendant acted is the determination of whether the plaintiff has asserted a violation of a constitutional right at all." Siegert, 500 U.S. at 232, 111 S.Ct. 1789. Thus, it is "the better approach ... to determine first whether the plaintiff has alleged a deprivation of a constitutional right at all" before turning to the question of whether the right was clearly established so that an objectively reasonable officer would have known of it. County of Sacramento v. Lewis, --- U.S. ----, 118 S.Ct. 1708, 1714 n. 5, 140 L.Ed.2d 1043 (1998).
 
 
 18
 When determining whether a reasonable officer would have been aware of a constitutional right, we do not impose on the official a duty to sort out conflicting decisions or to resolve subtle or open issues. "Officials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines." Maciariello v. Sumner, 973 F.2d 295, 298 (4th Cir.1992); see also Cromer, 88 F.3d at 1324. Thus, particularly in First Amendment cases, where a sophisticated balancing of interests is required to determine whether the plaintiff's constitutional rights have been violated, "only infrequently will it be 'clearly established' that a public employee's speech on a matter of public concern is constitutionally protected." DiMeglio, 45 F.3d at 806; see also Bartlett v. Fisher, 972 F.2d 911, 916-17 (8th Cir.1992) (noting that qualified immunity should rarely be denied under Pickering which requires a balancing to resolve a public employee's First Amendment claim).
 
 
 19
 With these principles of qualified immunity in hand, we turn to the case before us, first to determine whether McVey stated a cause of action under the First Amendment.
 
 IV
 
 20
 The First Amendment protects public employees from termination of their employment in retaliation for their exercise of speech on matters of public concern. Protection of the public interest in having debate on matters of public importance is at the heart of the First Amendment, see Pickering v. Board of Educ., 391 U.S. 563, 573, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), and, indeed, speech concerning public affairs is the essence of self-government, see Connick v. Myers, 461 U.S. 138, 145, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983). Because of the nature of the interest protected, however, public employee speech about matters of personal interest are not so protected. Thus, "[p]ersonal grievances, complaints about conditions of employment, or expressions about other matters of personal interest do not constitute speech about matters of public concern that are protected by the First Amendment." Stroman v. Colleton County Sch. Dist., 981 F.2d 152, 156 (4th Cir.1992).
 
 
 21
 But this First Amendment protection of speech on matters of public concern is not absolute and must be tempered by the government's interest in governmental effectiveness, efficiency, order, and the avoidance of disruption. As an employer, the government is entitled to maintain discipline and ensure harmony as necessary to the operation and mission of its agencies. See Connick, 461 U.S. at 142, 147, 103 S.Ct. 1684. And for this purpose, the government has an interest in regulating the speech of its employees. As the Court in Connick summarized this interest:
 
 
 22
 To this end, the Government, as an employer, must have wide discretion and control over the management of its personnel and internal affairs. This includes the prerogative to remove employees whose conduct hinders efficient operation and to do so with dispatch. Prolonged retention of a disruptive or otherwise unsatisfactory employee can adversely affect discipline and morale in the work place, foster disharmony, and ultimately impair the efficiency of an office or agency.
 
 
 23
 461 U.S. at 151, 103 S.Ct. 1684 (quotation marks and citations omitted).
 
 
 24
 In recognition of these potentially competing interests, to determine whether an employee has a cause of action under the First Amendment for retaliatory discharge, we must balance "the interests of the [public employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." Pickering, 391 U.S. at 568, 88 S.Ct. 1731.
 
 
 25
 Thus, to determine whether a public employee has stated a claim under the First Amendment for retaliatory discharge, we must determine (1) whether the public employee was speaking as a citizen upon a matter of public concern or as an employee about a matter of personal interest; (2) whether the employee's interest in speaking upon the matter of public concern outweighed the government's interest in providing effective and efficient services to the public; and (3) whether the employee's speech was a substantial factor in the employee's termination decision. See Stroman, 981 F.2d at 156; see also Cromer, 88 F.3d at 1325.
 
 
 26
 In balancing the public employee's interest in speaking on matters of public concern against the government's interest in providing effective and efficient government through its employees, we must take into account the context of the employee's speech, including the employee's role in the government agency, and the extent to which it disrupts the operation and mission of the agency. See Rankin v. McPherson, 483 U.S. 378, 388-91, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987). Factors relevant to this inquiry include whether the employee's speech (1) "impairs discipline by superiors"; (2) impairs "harmony among co-workers"; (3) "has a detrimental impact on close working relationships"; (4) impedes the performance of the public employee's duties; (5) interferes with the operation of the agency; (6) undermines the mission of the agency; (7) is communicated to the public or to co-workers in private; (8) conflicts with the "responsibilities of the employee within the agency"; and (9) makes use of the "authority and public accountability the employee's role entails." Id.
 
 
 27
 Thus, a public employee, who has a confidential, policymaking, or public contact role and speaks out in a manner that interferes with or undermines the operation of the agency, its mission, or its public confidence, enjoys substantially less First Amendment protection than does a lower level employee. See, e.g., Bates v. Hunt, 3 F.3d 374, 378 (11th Cir.1993) (a confidential or policy-making employee, or one whose job requires extensive public contact on employer's behalf, "does not have much protection under the First Amendment when he speaks or acts in a hostile way toward his employer"); Kinsey v. Salado Indep. Sch. Dist., 950 F.2d 988, 996 (5th Cir.1992) (en banc) (because plaintiff's position as school superintendent was "so high-level and confidential," not much evidence was necessary to demonstrate disruption in the workplace); Gonzalez v. Benavides, 712 F.2d 142, 148 (5th Cir.1983) (explaining that high-level public executives have little expectation of free speech rights and generally accept employment knowing that speech critical of the employer's policy subjects them to discharge). This principle tends to merge with the established jurisprudence governing the discharge of public employees because of their political beliefs and affiliation. While such beliefs and affiliation are protected by the First Amendment, dismissal may be justified if political party affiliation can be demonstrated to be "an appropriate requirement for the effective performance of the public office involved." Branti v. Finkel, 445 U.S. 507, 518, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980); see also Elrod v. Burns, 427 U.S. 347, 372, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976) (plurality opinion) (limiting patronage dismissal to policymaking positions); Stott v. Haworth, 916 F.2d 134, 143-44 (4th Cir.1990) (listing cases in which patronage dismissals were justified, such as, e.g., confidential secretary, regional director of a state urban development corporation, city police chief, first deputy commissioner of water department, superintendent of employment for park district, deputy parks commissioner).
 
 
 28
 With these principles for balancing in hand, we turn to determine whether McVey has stated a cause of action under the First Amendment and whether we can, based on the complaint's allegations, weigh McVey's interest in speaking on matters of public concern against the government's interest in providing effective and efficient government.
 
 
 29
 McVey's complaint alleges that she served as manager of the airport and reported to the Airport Commission. It alleges that under "her leadership," the airport experienced an unprecedented expansion for which she received "numerous instances of public recognition." It was also to her that the local newspaper directed its FOIA request, and it was she who signed the response to the request. But the complaint does not resolve on its face the extent to which the Rankin balancing factors were satisfied or the extent to which McVey's role was a confidential, policymaking, or public contact role. The complaint also does not reveal whether McVey's role was equivalent to that of an agency head. Depending on the response to these inquiries, airing publicly the tensions between her and the Airport Commission might well be the type of disrupting and confidence-destroying speech that the Supreme Court in Connick held must be subservient to the agency's interests. Moreover, the circuit courts which have addressed this issue have generally denied agency heads or high-ranking agency personnel First Amendment protection. See, e.g., Weisbuch v. County of Los Angeles, 119 F.3d 778, 783-84 (9th Cir.1997) (medical director of department of health services); Rash-Aldridge v. Ramirez, 96 F.3d 117, 119-20 (5th Cir.1996) (city-council appointee on a metropolitan planning board); Bates, 3 F.3d at 377-78 (administrative assistant in the governor's office of constituent affairs); Sims v. Metropolitan Dade County, 972 F.2d 1230, 1236-38 (11th Cir.1992) (member of office of black affairs in county community affairs office); Kinsey, 950 F.2d at 995-96 (public school superintendent); Hall v. Ford, 856 F.2d 255, 264-65 (D.C.Cir.1988) (public university athletic director); Gonzalez, 712 F.2d at 148-50 (executive director of community action agency).
 
 
 30
 Thus, while we agree with McVey that her private protests to commission members regarding the method by which to respond to the FOIA request constituted speech, see Connick, 461 U.S. at 146, 103 S.Ct. 1684; Cromer, 88 F.3d at 1326, as did her response letter to the newspaper, we conclude that the question whether McVey's interest in such speech was outweighed by the agency's interests in effective and efficient management as well as public confidence is still open for determination. Thus, the district court must determine whether McVey was the agency's public representative and whether the agency's interests outweighed her interest in speaking out publicly. This is the concomitant determination necessary for resolving the defendants' immunity claim. If the court determines that McVey's First Amendment rights were in fact violated, then it would still have to determine whether the First Amendment principles were "clearly established" so that a reasonable commissioner would have known that he was violating McVey's rights when he voted to fire her.
 
 
 31
 In short, we affirm the district court's ruling to defer deciding on the qualified immunity issue until the record is better developed on the immunity issues.
 
 
 32
 AFFIRMED AND REMANDED.
 
 
 33
 MURNAGHAN, Circuit Judge, concurring in part and concurring in the judgment:
 
 
 34
 I am generally in agreement with what Judge Niemeyer has written, and I join his opinion. But Judge Niemeyer omits a few important points that I believe must be noted. I therefore write separately to clarify one issue of law and a few issues of fact that may eventually determine the outcome of this case.
 
 I.
 
 35
 Judge Niemeyer's statement of the Pickering balancing test neglects to mention the interests of the public that are served by an individual's speech. See ante at 279-280, 282. Both the Supreme Court and the Fourth Circuit have explained that the public interest in the employee's speech must be considered when weighing his right to speak against the government-employer's interest in controlling the workplace. A stronger showing of public interest in the speech requires a concomitantly stronger showing of government-employer interest to overcome it. See Connick v. Myers, 461 U.S. 138, 152, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983) ("We caution that a stronger showing [of employer interest] may be necessary if the employee's speech more substantially involved matters of public concern."); Cromer v. Brown, 88 F.3d 1315, 1326 (4th Cir.1996). ("Interests of the community also weigh in the [Pickering ] balance."); see also Azzaro v. County of Allegheny, 110 F.3d 968, 980 (3d Cir.1997) (en banc ) ("On one side [of the Pickering balancing] we weigh the public employee's interest in speaking about a matter of public concern and the value to the community of her being free to speak on such matters."); O'Connor v. Steeves, 994 F.2d 905, 915 (1st Cir.1993) ("Under Pickering, we are required to balance the significance of the interests served by the public-employee speech--including the employee's interests in communicating, and the interests of the community in receiving, information 'on matters of public importance'--against the governmental employer's legitimate interests in preventing unnecessary disruptions and inefficiencies in carrying out its public service mission.").
 
 
 36
 In Cromer we observed that the public had an interest in the subject matter of the individual speech, see 88 F.3d at 1327, 1329, even though the speech was only privately made, see id. at 1326. We held that the plaintiff's "individual interests" to be balanced under Pickering "merge in a real sense with those of the community at large," and together outweighed the interests of the government-employer in controlling its employee's speech. Id. at 1327-29. Similarly, in Piver v. Pender County Bd. of Educ., 835 F.2d 1076 (4th Cir.1987), we explained the Pickering balancing test as examining whether "the interests of the speaker and the community in the speech outweigh the interests of the employer in maintaining an efficient workplace," id. at 1078 (emphasis added). In concluding that the balancing tipped in the plaintiff's favor, we repeatedly considered "the audience's interests in the speech at issue" and examined the features of the speech that would "enhance its importance to [the plaintiff] and to the public." Id. at 1080-81 (emphasis added).
 
 
 37
 Particularly in this case, where the speech allegedly concerned the integrity of a Virginia Freedom of Information Act (FOIA) request from a newspaper, the public's interest in the speech cannot be neglected. As discussed below, further development of the record is necessary before any conclusions can be drawn about the extent of that public interest.
 
 II.
 
 38
 In remanding, Judge Niemeyer forecasts the potential facts that may be developed with further discovery or even trial. I agree with what he has said; I only wish he had said more. Judge Niemeyer's forecast seems cramped, and even one-sided, because he fails to acknowledge those potential facts that may support rather than undermine McVey's First Amendment claim. Three issues of fact appear which, if the evidence proves favorable to McVey, would tilt the First Amendment balance decidedly in her favor.
 
 
 39
 The first issue involves McVey's role as manager of the airport. Judge Niemeyer correctly explains that the greater "the extent to which McVey's role was a confidential, policymaking, or public contact role," the greater will be the government-employer's interest in controlling (and even censoring) her speech. Ante at 278-279. If her "role was equivalent to that of an agency head," even a purely ideological disagreement with her employer would be fair grounds for her termination. Id.
 
 
 40
 But the corollary is also true: the less her role involved confidential duties, policymaking and public contact, the less interest the Airport Commission had in censoring her speech. Despite the puffery in her complaint, McVey's position may turn out to have been a mostly ministerial one, without real policymaking authority. Perhaps her role required only the implementation of policy designed by the Virginia Highland Airport Commission, with little room for creativity or discretion. Perhaps her role was not like that of an "agency head" at all. If so, the government-employer's interest in controlling her speech would be far less.
 
 
 41
 The second issue involves the importance of the speech to the public. Judge Niemeyer characterizes the speech for which McVey was terminated as a mere "airing publicly [of] the tensions between her and the Airport Commission." Id. If that characterization proves to be correct, then McVey's interest as speaker, and the related public interest served by such speech, will be quite low. Id.
 
 
 42
 But on the other hand, there may turn out to have been a great public interest served by McVey's speech. For instance, her speech may have been intended to prevent or expose illegal actions by the Airport Commission. Construing her complaint in its strongest light, McVey has alleged that she was fired for refusing to lie on a Virginia FOIA request, that is, refusing to certify as correct documents she had personally witnessed being falsified, and also for writing a letter to the requesting newspaper explaining which documents she did not so certify. Such speech is at the core of that protected by the First Amendment because it implicates the integrity of our public institutions and the means by which our democracy is preserved--through a free and open press. If McVey's speech were intended to prevent or disclose the illegal actions of her government-employer, her interest in that speech, which encompasses the public's interest, would be compelling, and a very strong showing of disruption of legitimate government functions would be required to overcome it. See, e.g., Khuans v. School Dist. 110, 123 F.3d 1010, 1018 (7th Cir.1997) ("When an employee speaks out about actual wrongdoing or breach of public trust on the part of her superiors, or speaks on serious matters of public concern, the government must make a more substantial showing than otherwise that the speech is, in fact, likely to be disruptive before the employee's actions may be punished."); Hafley v. Lohman, 90 F.3d 264, 267 (8th Cir.1996) (holding that "it is clear that [the plaintiff's] interest in exposing an attempt to obstruct a criminal investigation into the handling of public funds outweighs the state's interest in the efficiency of its public services."), cert. denied, --- U.S. ----, 117 S.Ct. 1081, 137 L.Ed.2d 216 (1997); Voigt v. Savell, 70 F.3d 1552, 1562 (9th Cir.1995) ("Johnson's speech included allegations of criminal wrongdoing and abuse of power. Such accusations involve matters of inherent public concern and the burden on the employer in demonstrating that its interests outweigh the First Amendment interest of the employee is correspondingly onerous."), citing Johnson v. Multnomah County, 48 F.3d 420, 426 (9th Cir.1995).
 
 
 43
 The cases cited by Judge Niemeyer in which adverse employment actions were upheld despite First Amendment claims, see ante at 278-279, do not address the situation where a public employee's speech is intended to prevent or expose the illegal actions of his government-employer. The bulk of the cited cases involve mere policy disagreements between employees and their government-employers. See, e.g., Weisbuch v. County of Los Angeles, 119 F.3d 778, 780, 782 (9th Cir.1997) (Medical Director demoted for criticizing how much the Director of Health Services listened to medical opinion before making decisions); Rash-Aldridge v. Ramirez, 96 F.3d 117, 118-19 (5th Cir.1996) (city council member removed from a board position for supporting a different highway access plan than the one supported by the city council); Sims v. Metropolitan Dade County, 972 F.2d 1230, 1231-32 (11th Cir.1992) (employee in the Department of Community Affairs, the function of which is to "foster mutual understanding and tolerance among all of Miami's ethnic groups," who was suspended for making inflammatory remarks in support of a racial boycott); Kinsey v. Salado Indep. Sch. Dist., 950 F.2d 988, 990-91 (5th Cir.1992) (school superintendent who was fired for speaking against the winning slate in a school board election, because he disagreed with the winners' view of the school board's role in the daily operation of the schools); Hall v. Ford, 856 F.2d 255, 257, 265 (D.C.Cir.1988) (Athletic Director fired for a "pattern of speech concerning the proper response to [National Collegiate Athletic Association and university] rule violations within the [athletic] department," which speech contradicted the views of the President and Board of Trustees as to how certain "policies should have been formulated and implemented"); Gonzalez v. Benavides, 712 F.2d 142, 143-44 (5th Cir.1983) (Executive Director of community action agency fired for refusing to recognize the supervisory authority of the county commissioners court). The only exception is Bates v. Hunt, 3 F.3d 374 (11th Cir.1993), which concerned a Governor's administrative assistant who was fired for supporting a civil suit against the Governor, see id. at 375-76. But the Eleventh Circuit specified that it did not view the dispute that the speech was about as "a matter of great public concern." Id. at 377 n. 5 ("Although the Constitution was invoked, the [subject of the speech for which the plaintiff was fired] mainly was a dispute between one employee and his employer about internal office matters."). Although a high-level policymaker enjoys little First Amendment protection for her statements about her government employer's policy, the balance may be different for her statements preventing or exposing government wrongdoing. See Flynn v. City of Boston, 140 F.3d 42, 47 (1st Cir.1998) (explaining, in finding that a policy level official's right to speak about policy was outweighed by the government-employer's right, that "[t]his does not mean that anything goes for policy-related positions: this would be a different case if an executive were fired for reporting a crime"), petition for cert. filed, 67 U.S.L.W. 3084 (July 20, 1998) (No. 98-153).
 
 
 44
 The third factual issue to be developed is the degree to which McVey's speech disrupted the Airport Commission's legitimate interests as employer. The Rankin factors, described at pages 279 and 280 of Judge Niemeyer's opinion, reflect a number of ways in which a public employee's speech might disrupt the "effective and efficient management" of a government agency and the public confidence in that agency, ante at 279. Judge Niemeyer correctly notes that "the complaint does not resolve on its face the extent to which the Rankin balancing factors were satisfied" in this case, and thus it is premature to evaluate the strength of the employer's interest in controlling McVey's speech. Id. at 278-279.
 
 
 45
 Although Judge Niemeyer does not do so, it should be noted that the Rankin factors regard disruption only of the lawful, legitimate operations of the government-employer. See Rankin v. McPherson, 483 U.S. 378, 388, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987) (explaining, in elucidating the factors to be considered when evaluating the government interest, that "[t]he State bears a burden of justifying the discharge on legitimate grounds" (emphasis added)). The government-employer has no legitimate interest in efficiently breaking the law or defrauding the public. See Johnson, 48 F.3d at 427 ("In other words, the County does not have a legitimate interest in covering up mismanagement or corruption and cannot justify retaliation against whistleblowers as a legitimate means of avoiding the disruption that necessarily accompanies such exposure."). If it turns out that the only government operations that McVey's speech disturbed were the falsification of a Virginia FOIA response and the pursuit, at Kenneth Stacy's instruction, of improper tactics to delay public awareness of the Airport Commission's wrongdoing, then those illegitimate government interests will not outweigh the First Amendment interests in McVey's speech, whether McVey was a high-ranking policymaker or not.
 
 III.
 
 46
 This case will require discovery, and perhaps trial, before the district court can fully weigh McVey's interest in speaking and the public's interest in her speech against the government-employer's interest in controlling that speech. I do not know how this necessarily fact-specific balancing will come out. Nor can I determine based merely on the allegations in the complaint whether, even if McVey's First Amendment rights have been violated, qualified immunity will nonetheless be appropriate because the results of the balancing will prove not to have been clear to a reasonable official.
 
 
 47
 Subject to these remarks, I join the opinion of Judge Niemeyer.
 
 
 48
 MICHAEL, Circuit Judge, concurring in part and concurring in the judgment:
 
 
 49
 I concur in Judge Niemeyer's opinion for the court, except to the extent it is qualified by Judge Murnaghan's separate opinion. In addition, I concur in the judgment.