Filed:  June 9, 2003

UNITED STATES COURT OF APPEALS

FOR THE FOURTH CIRCUIT

No. 02-1153
(CA-01-225-7)

Thomas S. Mills,

Plaintiff - Appellant,

versus

Charles W. Steger, etc., et al.,

Defendants - Appellees.

O R D E R

The court amends its opinion filed May 14, 2003, as follows:

On page 2, second full paragraph of text, lines 1-2 -- the phrase is corrected to read "a public radio station in Roanoke, Virginia."

For the Court - By Direction

/s/ Patricia S. Connor
Clerk

**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

---

THOMAS S. MILLS,
    *Plaintiff-Appellant,*

    v.

CHARLES W. STEGER, in his
individual capacity; LARRY HINCKER,
in his individual capacity; RAYMOND
SMOOT, in his individual capacity;
MINNIS RIDENOUR, in his individual         No. 02-1153
capacity,
    *Defendants-Appellees,*

    and

VIRGINIA POLYTECHNIC INSTITUTE AND
STATE UNIVERSITY; WILLIAM E.
LANDSIDLE, Comptroller of the
Commonwealth of Virginia,
    *Defendants.*

---

Appeal from the United States District Court
for the Western District of Virginia, at Roanoke.
Samuel G. Wilson, Chief District Judge.
(CA-01-225-7)

Argued: January 22, 2003

Decided: May 14, 2003

Before WILLIAMS and MICHAEL, Circuit Judges, and
Morton I. GREENBERG, Senior Circuit Judge of the
United States Court of Appeals for the Third Circuit,
sitting by designation.

---

Affirmed by unpublished per curiam opinion.

---

## COUNSEL

**ARGUED:** Monica Taylor Monday, GENTRY, LOCKE, RAKES & MOORE, Roanoke, Virginia, for Appellant. Sydney E. Rab, Assistant Attorney General, OFFICE OF THE ATTORNEY GENERAL, Richmond, Virginia, for Appellees. **ON BRIEF:** S.D. Roberts Moore, Anthony Marc Russell, GENTRY, LOCKE, RAKES & MOORE, Roanoke, Virginia, for Appellant.

---

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

---

## OPINION

PER CURIAM:

Thomas S. Mills appeals from a grant of summary judgment to the Virginia Polytechnic Institute and State University and four individual defendants on his claims that they violated his due process and First Amendment rights. We affirm, although some of our reasoning is slightly different than the district court's.

I.

Mills was the station manager at WVTF, a public radio station in Roanoke, Virginia, owned by the Virginia Tech Foundation with a broadcast area covering most of western Virginia and parts of North Carolina and West Virginia. In that position, he was an employee of Virginia Polytechnic Institute and State University (Virginia Tech or the University). His employment was based on a series of annually renewable contracts, and he was entitled to the protections of the Faculty Handbook. As station manager he had primary responsibility for programming decisions and generally acted independently of the Uni-

versity and the WVTF staff. Mills served in this position for nearly twenty-four years; during that time the station substantially broadened its audience, won national acclaim for its own programming, and moved out of insolvency. Mills himself consistently received positive reviews from his supervisors. He also received awards and honors from others in public broadcasting.

Mills's conflict with his supervisors at Virginia Tech began in November 1999, when WVTF decided to move the Metropolitan Opera broadcast from a prime programming slot on Saturday to Sunday. The Metropolitan Opera, however, refused to allow this delayed broadcast, and WVTF (through Mills) opted to cancel the program. Larry Hincker, Director of University Relations, initially supported the decision to cancel. However, Raymond Smoot, the Vice President for Administration at Virginia Tech, Minnis Ridenour, the Executive Vice President, and Charles Steger, the President, told Hincker to instruct Mills to resume the Saturday broadcast of the opera program. Hincker wrote Mills a letter, dated December 16, 1999, conveying this instruction, but saying that Hincker felt he (Hincker) had failed the station. Mills in turn wrote a letter to Hincker objecting to the decision; this letter was leaked to the press, and the press contacted Mills for a reaction.

As Mills voiced his objections to the University's reversal of his decision to cancel the opera, his supervisors became increasingly concerned about his public statements. When listeners wrote to the station to express their views about broadcasting the opera, Mills responded with letters claiming that his supervisors were interfering with programming decisions. As a result of these letters, Smoot wrote to Hincker, suggesting that Mills should be terminated. Mills also gave statements to a reporter for the Roanoke Times about Virginia Tech's involvement in programming decisions. After seeing the article, Ridenour wrote to Hincker, saying that they needed to "decide what action to take." Moreover, Mills wrote a letter to the editor of the Roanoke Times, identifying himself as the station manager and expressing his concerns. Finally, Mills was interviewed about the controversy by a public radio trade publication in January 2000. In that interview he said that he "used to think [calling fans of the Metropolitan Opera] `Opera Nazis' was harsh. Not anymore. If anything it's a little tame."

3

On March 3, 2000, Hincker removed Mills from his position as station manager of WVTF. When Mills refused to resign as requested, Hincker decided to terminate him. On March 10 Hincker wrote to Mills, providing him with a lengthy list of the ostensible reasons for firing him; these included poor judgment, abuse of power, and failure to follow supervisors' directions. Mills was not, however, removed from the payroll. On March 30, 2000, Hincker wrote to Mills, saying that Mills was being reassigned to an AM radio station that broadcast out of Blacksburg, Virginia. Ridenour and Smoot participated in this decision.

Mills objected to the reassignment because the Faculty Handbook requires six months' notice for a transfer to a new job site that is more than thirty-five miles from the current job site. The AM station is forty miles from WVTF's offices. Mills's lawyer wrote to Hincker several times to tell him that Mills would not accept the reassignment because it violated Virginia Tech's transfer policy. On April 20, 2000, Hincker drafted a letter to Mills, telling him that he was beginning the dismissal process because of Mills's failure to show up at his new job; it appears, however, that Hincker never mailed the letter. On April 24, 2000, Mills notified Virginia Tech that he intended to begin the grievance process provided for in the Faculty Handbook. On the same day, Hincker wrote to Mills, directing him to appear at a meeting on April 25, 2000, to discuss the dismissal proceedings and telling him that he was being dismissed for his failure to report to work at the AM station. Mills did not hear from his lawyer about the April 25 meeting until late in the evening on April 24, and he did not receive his copy of Hincker's letter until several days after the date scheduled for meeting. Due to the late notice, Mills and his lawyer did not attend the meeting. Mills then received a letter from Hincker dated April 25, 2000, telling him he had three days to send a written response to the reasons for his dismissal. Mills responded with a nineteen-page letter. Hincker testified that he "had already put in place the rationale and this did not change [his] rationale." Consequently, Mills was fired on May 2, 2000.

Mills then began the multi-step grievance process. First, the decision was reviewed by Hincker and then by Smoot. Next, Mills's objections were heard by a hearing panel comprised of members of the Virginia Tech faculty. After hearing evidence, the panel decided

4

that Mills's reassignment violated the Faculty Handbook procedures. Ridenour reviewed the findings and recommendations of the hearing panel and then made his own recommendation. Ridenour refused to reinstate Mills as WVTF's station manager or provide him a job within thirty-five miles of the WVTF station, but he offered to let Mills remain on the payroll for six months, which would allow Mills to complete twenty-five years of service at the University. The final review of a termination is normally made by the University's president. The president (Steger) recused himself from this review, however, and it was undertaken by James Bohland, the Interim Provost. Bohland endorsed Ridenour's proposed solution, and Mills rejected it.

Mills originally brought suit against the University and the individual defendants in Virginia state court, claiming violations of his due process and First Amendment rights. The defendants removed the case to the United States District Court for the Western District of Virginia. Following discovery, the defendants moved for summary judgment, which the district court granted. The district court concluded that there were no violations of Mills's due process or First Amendment rights; even if there had been a violation, the defendants were entitled to qualified immunity, the court held. Mills appeals.

We review the district court's grant of summary judgment de novo. *Goldstein v. Chestnut Ridge Volunteer Fire Co.*, 218 F.3d 337, 340 (4th Cir. 2000). To defeat the defendants' claim to qualified immunity, Mills must demonstrate that they violated one of his constitutional rights, that the violation was clearly established at the time of the event, and that a reasonable official would have known that the conduct was a constitutional violation. *See Henderson v. Simms*, 223 F.3d 267, 271 (4th Cir. 2000). We will address Mills's due process and First Amendment claims in turn.

II.

A.

To conclude that Mills's due process rights were violated, we must find that he had a property interest in continued employment and that Virginia Tech's procedure for the termination of his employment was not consistent with due process. *Morris v. City of Danville*, 744 F.2d

5

1041, 1044 (4th Cir, 1984); *see also Volk v. Coler*, 845 F.2d 1422, 1430 (7th Cir. 1988). Mills was not a tenured faculty member; he worked under an employment contract that was subject to annual renewal. Mills therefore did not have a protected interest in remaining at Virginia Tech past the ending date of his contract. *See Perry v. Sindermann*, 408 U.S. 593, 599 (1972). However, he might have had a property interest in continued employment for the remainder of his contract, that is, the period between his termination on May 2, 2000, and the June 30 ending date for his contract. Mills's argument that he had a property interest in continued employment at WVTF, rather than at the Blacksburg station, is without merit. *Huang v. Bd. of Governors*, 902 F.2d 1134, 1141-42 (4th Cir. 1990) (concluding that a transfer to a different department did not affect a property right); *see also Volk*, 845 F.2d at 1430. Similarly, the University's initial decision to fire Mills in March did not affect a property interest because Mills never stopped receiving his salary. *See Huang*, 902 F.2d at 1141 (noting that a plaintiff's property interest is satisfied by full compensation). We will assume, therefore, that Mills did have a property interest in continued employment for the remainder of the term of his contract and that the University interfered with this right when it terminated him on May 2, 2000. Nevertheless, we believe that the school's termination procedures adequately protected Mills's due process rights.

B.

Mills first claims that his pretermination hearing was inadequate. Pretermination procedures are not required to be extensive; they are merely "an initial check against mistaken decisions — essentially, a determination of whether there are reasonable grounds to believe that the charges against the employee are true and support the proposed action." *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 545-46 (1985). Because of the limited function that pretermination hearings are supposed to serve, the state is only required to provide notice of the action and give the employee an opportunity to respond. *See Gray v. Laws*, 51 F.3d 426, 438 (4th Cir. 1995). Here, the University did both. It is clear that Mills received ample advance notification of his termination and the reasons for it. In March Mills received a letter from Hincker, citing eight problems with Mills's work. Moreover, Hincker informed Mills of the specific reason for his termination —

6

his refusal to work in Blacksburg — in the April 24, 2000, letter. Mills also had, and used, an opportunity to explain his side of the story before his termination on May 2. He sent Hincker a nineteen-page letter on April 26, responding to the University's complaints about his performance. This notice and response satisfy the due process requirements for a pretermination hearing.

Mills concedes that he had an opportunity to present his side of the story to Hincker. He says, however, that this opportunity was a sham because Hincker was both the initial and final decisionmaker in the pretermination process and because Hincker said in an affidavit that Mills's letter did not change his views. Given the limited role of a pretermination hearing, neither of these concerns rise to the level of a constitutional violation. The same person can be, and often is, involved in multiple stages of the review process. *See Morris*, 744 F.2d at 1044-46. Moreover, it would be unusual if an employer reviewing an initial decision to terminate did not already have an expectation that the employee should be terminated. *See Ryan v. Ill. Dep't of Children & Family Servs.*, 185 F.3d 751, 762 (7th Cir. 1999). Due process merely requires that the decisionmaker keep an open mind when reviewing the employee's side of the story. Although Hincker's mind was not changed when he read Mills's letter, there is no suggestion that he ignored the letter altogether; rather, it is clear that Mills's letter did not alleviate Hincker's concerns about Mills's performance. We therefore conclude that Mills's pretermination proceedings were consistent with due process.

### C.

Mills next claims that his post-termination review was constitutionally defective because the decisionmakers were not impartial. He cites two reasons to support his claim of bias. He first argues that the decisionmakers' review was inadequate because they had ex parte conversations about his termination and viewed ex parte information about him. He then argues that the review was biased because the same people participated in multiple levels of the decisionmaking. Neither complaint rises to the level of a due process violation.

The fact that some of those involved in approving Mills's termination received ex parte communications does not by itself create a due

7

process violation. *See Duffield v. Charleston Area Med. Ctr., Inc.*, 503 F.2d 512, 518-19 (4th Cir. 1974). Ex parte communications are generally only due process violations when the information contained in them is both new and material. *See Stone v. FDIC*, 179 F.3d 1368, 1376-77 (Fed. Cir. 1999). Although Mills claims that Hincker, Smoot, and Ridenour had access to documents that he was unable to see at "pertinent times" during the proceedings, Appellant's Br. at 28, none of these individuals was the final decisionmaker. *Duffield*, 503 F.2d at 518-19 (finding that a decision allegedly based on ex parte communications was not a due process violation because the decision was not final). We focus, therefore, on the ex parte communications reviewed by Bohland, the final decisionmaker, to determine whether anything unavailable to Mills was new and material. Mills points to only two documents that Bohland saw to which Mills did not have access. The first was a letter from Mills's lawyer concerning this suit. It is hard to imagine how Mills could be surprised that Bohland saw a letter drafted by his lawyer or how he can say that he had no opportunity to see or respond to it. The second document was a timeline prepared by Hincker, which the parties have not provided for our review. Mills points to no information included in the timeline that would have had an effect on Bohland's decision. At most, we would expect that the timeline clarified the events in the case, but it is hard to imagine how it would have led Bohland to a different conclusion. Nor do we believe the information in the timeline was new. All of the relevant dates and events would have been documented in other ways in the case file. The timeline only provided a useful summary for Bohland of events otherwise known to Mills. Because Mills has not established that the ex parte communications received by the final decisionmaker were either new or material, we conclude that they did not violate Mills's due process rights.

We also reject Mills's claim that the participation of some of his supervisors in more than one stage of the proceedings created a due process violation. As noted above, the same person may participate in more than one level of the review process. *See, e.g.*, *Morris*, 744 F.2d at 1044-46; *Duffield*, 503 F.2d at 517. Moreover, even if Hincker, Smoot, and Ridenour should have been excluded from later decisionmaking, the final decision to terminate Mills was made by Bohland, who was not involved at any earlier stage. Although he considered the views of those Mills believes were biased against him,

8

Bohland also had the benefit of the views of the faculty panel, and Mills has made no suggestion that this panel was in any way biased against him. We therefore conclude that Mills's post-termination review was constitutionally adequate. Because we see no constitutional violations in either Mills's pre- or post-termination proceedings, we turn to his First Amendment claim.

III.

A.

To establish that his First Amendment rights were violated, Mills must show that he spoke about a matter of public concern, that the University deprived him of some valuable benefit, and that there was a nexus between the adverse action and his protected speech. *See Huang*, 902 F.2d at 1140. Finally, he must show, as required by the Supreme Court in *Pickering v. Board of Education*, 391 U.S. 563 (1968), that his interest in speech outweighs his employer's interest in effective job performance. *Huang*, 902 F.2d at 1140 n.7.

Mills was speaking out on a matter of public concern. One of the critical factors in determining whether speech is on public or private matters is whether it concerns matters of public debate or whether it reflects merely personal pique and internal employment issues. *Cooper v. Johnson*, 590 F.2d 559, 562 (4th Cir. 1979). The substance and procedure of programming decisions by a public radio station that regularly solicits direct contributions from its listeners is a matter of public concern. *See Schneider v. Indian River Comty. Coll.*, 875 F.2d 1537, 1542-43 (11th Cir. 1989); *Aldrich v. Knab*, 858 F. Supp. 1480, 1495-96 (W.D. Wash.), *rev'd on other grounds*, 36 F.3d 1102 (9th Cir. 1994) (unpublished opinion). Indeed, the record reflects a great deal of public interest in the opera broadcast dispute, as demonstrated by several newspaper articles and many phone calls and letters from listeners and donors. An issue that engenders this sort of response from listeners, donors, and the press can hardly be considered a private matter of interest only to those within the radio station's management. *Cf., Aldrich*, 858 F. Supp. 1495-96. We conclude, therefore, that Mills spoke on a matter of public concern.

It is equally clear that the University deprived Mills of a valuable benefit. While his due process claim requires him to demonstrate a

9

protected property interest, to bring a First Amendment claim Mills only needs to show that he was subject to some adverse employment action sufficient to chill his speech. *See Goldstein*, 218 F.3d at 356. Here, his transfer to another radio station and his ultimate termination amount to such a deprivation for First Amendment purposes. *See Huang*, 902 F.2d at 1140.

Similarly, Mills has demonstrated a nexus between the deprivation of a valuable benefit and his speech. The timing of Hincker's initial decision to terminate him and then to transfer him to Blacksburg — just a few months after Mills began speaking out — is circumstantial evidence of the connection. *Cf. Pike v. Osborne*, 301 F.3d 182, 185 (4th Cir. 2002); *Carter v. Ball*, 33 F.3d 450, 460 (4th Cir. 1994). But Mills also has direct evidence linking these actions to his speech. Smoot, for example, sent a note to Hincker in reaction to one of Mills's letters, explaining that he "may have been too generous" when he initially recommended that Mills not be fired. Further, Ridenour wrote to Hincker, stating that they needed to discuss what to do in response to the Roanoke Times article. Together, the comments and the timing lead to a permissible inference that the University acted against Mills in response to his speech.

B.

Having cleared these obstacles, Mills still must show that his interest in speech outweighs the University's interest in efficient functioning of the radio station. In conducting this assessment, we are to consider the context of the speech, the employee's role in the workplace, and his organization's mission. *See McVey v. Stacy*, 157 F.3d 271, 278 (4th Cir. 1998); *see also Rankin v. McPherson*, 483 U.S. 378, 388-91 (1987). Several factors are relevant in making this determination. Many of these relate to the function of the organization: whether the speech impairs discipline or harmony in the organization, hinders the employee in the performance of his duties, interferes with the operation of the organization, or undermines the organization's mission. *See McVey*, 157 F.3d at 278; *see also Rankin*, 483 U.S. at 388-91. Other factors focus on the connection between the speech and the employee's role: whether the speech was made in public or private, whether the speech conflicts with the employee's official duties, and whether the speech used authority derived from the employee's

10

role at work. *See McVey*, 157 F.3d at 278; *see also Rankin*, 483 U.S. at 388-91.

Some agencies, such as police and fire departments, provide such essential services and depend so much on good working relations within the department that we place a premium on the government's interest as we conduct the *Pickering* balancing test. *See, e.g.*, *Goldstein*, 218 F.3d at 354-55 (noting that the interest in camaraderie and efficiency in a fire company merited "substantial weight"); *Cromer v. Brown*, 88 F.3d 1315, 1328 (4th Cir. 1996) (noting the wide latitude law enforcement agencies have in internal disciplinary matters). This is not such a case. *See also Aldrich*, 858 F. Supp. at 1496 (noting a less critical government interest in providing a radio station than in providing public health, safety, or self-government services or functions). At WVTF, as at any government organization, the state (the University) as an employer is entitled to rely on its employees not to interfere with its efforts to provide services to the public. *See Rankin*, 483 U.S. at 388. We take note, however, of the fact that the radio station, like the University community as a whole, is less likely to suffer a disruption in its provision of services as a result of a public conflict than is a public safety organization.

Given this backdrop, we note that the first group of factors, those that deal with whether the employee's speech is likely to have a direct effect on the ability of the organization to function, are not strongly implicated in this case. The University has made no allegation that the radio station was unable to function, that Mills refused to perform his on-air duties or did them in an unprofessional or otherwise inappropriate manner, or that Mills was no longer able to function effectively as station manager. The University points to the disruptive effect of handling communications from listeners, but it is hard to see this as a major strain on the station when contributions *increased* in the wake of the conflict. The University simply has not shown that Mills's speech did, or at any point realistically threatened to, interfere with effective functioning of the station. *See Daulton v. Affeldt*, 678 F.2d 487, 491 (4th Cir. 1982) (finding that speech did not interfere with the operation of a college where the "disputes did not . . . create any more disharmony than would expected when a subordinate criticizes her superiors on any subject").

11

The state's interest in preventing senior employees from speaking out in ways that undermine official policies, goals, and decisions, however, may be implicated here. An employee in a particularly sensitive position — in which he has a confidential, policymaking, or public contact role — receives less First Amendment protection than does a lower-level employee. *McVey*, 157 F.3d at 278. Mills's role as station manager and his use of that title in speaking on matters within his professional purview certainly implicate the state's interest in regulating speech of senior employees. We have, however, never found that senior officials receive no First Amendment protection. *See McVey*, 157 F.3d at 282 (Murnaghan, J., concurring in part and concurring in the judgment). Moreover, although Mills holds a senior position within the radio station, he is not in the sort of politically sensitive position that gives the state the broadest possible latitude in removing an employee. *See id.* at 280 (Murnaghan J., concurring in part and concurring in the judgment) (explaining that the protection given to an employee varies depending on the extent of the employee's "confidential duties, policymaking and public contact"). Unlike those who can be fired for purely ideological reasons, *see id.* (Murnaghan, J., concurring in part and concurring in the judgment), Mills's position is not one in which political "goals or programs affect the direction, pace, or quality of governance." *Stott v. Haworth*, 916 F.2d 134, 142 (4th Cir. 1990) (quoting *Jimenez Fuentes v. Torres Gaztambide*, 807 F.2d 236, 241-42 (1st Cir. 1986) (en banc) (internal quotations omitted)). We find it hard to see a comparison between one who implements broad state policy and Mills, who was a station manager. In short, no one reading his letters or interviews would view Mills as speaking for the state or the University. This reduced considerably the state's interest in restraining his speech.

The state's interest in ensuring the efficient functioning of one of its organizations, therefore, is not implicated by Mills's speech. Its interest in preventing senior officials from speaking in ways that undermine the state's policy goals is only mildly implicated here. On the other side, Mills's interest in informing those who support the station of what programming decisions had been made and how they were made — all matters of public concern — is considerable. We conclude, therefore, that the *Pickering* balancing test favors Mills and that his First Amendment rights were violated by the retaliatory transfer and termination.

12

C.

Having demonstrated that his First Amendment rights were violated, Mills has yet one more hurdle to overcome. He must show that the defendants are not entitled to qualified immunity because the law was clearly established and a reasonable official would have known that the action violated Mills's rights. *Henderson*, 223 F.3d at 271. Although plaintiffs have prevailed in some First Amendment retaliation cases, *see Cromer*, 88 F.3d at 1330-31, most do not, simply because the individualized assessment required by the *Pickering* balancing test means we can rarely say that the law was clearly established and that reasonable officials would have been aware of the law. *See id.* at 1330 n.11; *DiMeglio v. Haines*, 45 F.3d 790, 806 (4th Cir. 1995); *McVey*, 157 F.3d at 277.

Here, as with most cases, we cannot say that the defendants should have known that transferring or terminating Mills because of his speech would be a violation of his First Amendment rights. Given the fine line drawing required to determine whether someone in Mills's position is entitled to First Amendment protection under the *Pickering* test, we cannot say that the law with respect to Mills's First Amendment rights was clearly established. We also cannot say that a reasonable official should have known what the outcome of our First Amendment analysis would be. We therefore conclude that the defendants are entitled to qualified immunity on Mills's First Amendment claim.

IV.

On both counts, therefore, we agree with the district court's dismissal of the claims against the defendants. We affirm the district court's conclusion that the defendants did not violate Mills's due process rights. Unlike the district court, however, we find that Mills's First Amendment rights were violated; we agree with the court's grant of summary judgment, however, because the defendants are entitled to qualified immunity. The judgment of the district court is affirmed.

*AFFIRMED*

13